REINHARDT PRINTING COMPANY, Plaintiff-Appellee, v. SHARON SERLIN FELD, Defendant-Appellant.

First District (5th Division)   No. 85—2006

Opinion filed January 31, 1986.—Rehearing denied March 31, 1986.

Feiwell, Galper & Lasky, Ltd., of Chicago, for appellant.

David T. Rallo, of Rallo & Tepper, of Chicago, for appellee.

PRESIDING JUSTICE SULLIVAN delivered the opinion of the court:

Defendant brings this interlocutory appeal from the issuance of a preliminary injunction restraining her from violating certain post-employment noncompetition and nondisclosure covenants contained in an employment agreement with plaintiff, Reinhardt Printing Company.

The record discloses that plaintiff is a small commercial printing

company doing business primarily in the downtown area of Chicago. On March 7, 1983, defendant and Jack Reinhardt, then-president of plaintiff, signed a written "memorandum of agreement" which provided:

"In consideration of my employment by [plaintiff] and the continuance of such employment by [plaintiff], and the payment of my compensation as its employee and of entrusting to me by [plaintiff] of confidential information relative to the manufacture of printing and to its customers, I agree with [plaintiff] as follows:

(1) I agree that I will not divulge to others any information I may obtain during the course of my employment relating to the products, customers, prospective customers, sales information, trade secrets ideas, etc. of [plaintiff], whether contributed by me or not, without first obtaining written permission of [plaintiff] to do so.

(2) I further agree that all records of every nature and description which come into my possession during my employment with [plaintiff] whether prepared by me or otherwise, are and remain the property of [plaintiff], and upon termination of my employment with [plaintiff], said records shall be left with [plaintiff] as part of its property.

(3) I further agree that upon termination of employment I shall not, for a period of one (1) year, either directly or indirectly:

(a) Sell or attempt to sell printing to any firm to which I sold or solicited printing while in the employ of [plaintiff].

(b) Induce or attempt to induce any of the Company's customers not to do business with the Company.

(c) Induce or attempt to induce any of the Company's employees to terminate their relationship with the Company."

Defendant voluntarily terminated her employment with plaintiff on Friday, May 31, 1985, and began working as a salesperson for Anchor Graphics, another commercial printing company, also in downtown Chicago, the following Monday—June 3. On June 4, plaintiff filed its complaint and motion for injunctive relief.

At the hearing thereon, James Reinhardt—Jack Reinhardt's son and plaintiff's current president—testified that defendant's initial contact with plaintiff was through Doug Wyman, an outside hiring consultant it had retained, for a fee of $3,000, to interview and screen applicants for the sales position it had advertised and to thereafter provide sales training to the person eventually hired. When inter-

viewed, defendant stated that she had no experience in commercial printing sales but had been working as a salesperson for a wholesale envelope supplier and indicated that she could procure as customers various firms to which she sold envelopes; however, except for one publishing company, she did not do so. She was given a copy of the employment agreement the day before she was hired so that she could look it over and show it to an attorney if she wished. She expressed no objections to its terms at either the time she signed it or any time thereafter. Upon being hired, defendant underwent a training program which included two days "in the field" with Wyman—at an additional cost of $600—making random sales calls on downtown businesses, two of which resulted in orders, and two weeks "in-house" training which consisted of visiting plaintiff's various departments to view and learn all aspects of its business including production processes and sales techniques. Plaintiff also paid defendant's trade association dues and reimbursed her 50% of the costs of two courses she took at the Printing Industry Institute.

Reinhardt further testified that although defendant was hired only to procure new accounts, some "house accounts" normally handled by him or his father were eventually turned over to her. He identified 25 of 76 firms on a list prepared by defendant as either such "house accounts" or were customers which she was given company assistance in finding and/or developing. Throughout her employment, defendant had access to confidential information relating to specific customer identities and production methods as well as the raw data on costs and profit margins used in estimating price quotations, all of which was confidential information accumulated by plaintiff over a long period of time. When she submitted her termination notice on Tuesday, May 28, 1985, to be effective Friday, May 31, 1985, she acknowledged having signed the employment agreement at issue, but was "vague" in her response to his inquiry concerning her intention to honor it. The following Monday, defendant began working for Anchor Graphics, a direct competitor of plaintiff, and that day called on at least one of its customers to distribute her new business cards.

On cross-examination, Reinhardt stated that he was aware of defendant's educational and practical background in marketing and sales at the time she was hired, noting that it was a factor in the decision to do so. He also acknowledged that her assent to the terms of the employment agreement was a nonnegotiable condition of employment; that except for the accounts she personally serviced and those that were discussed with her, defendant would not necessarily know the identity of all of plaintiff's other customers; that customers often do

business with more than one printer; that Anchor Graphics produces four-color printing whereas plaintiff is not equipped to do so—specializing in one and two color materials—and must send out any orders for more than two color items; and that plaintiff does not do typesetting.

Defendant testified that she earned a bachelor's degree in marketing and sales and took two courses at the Printing Industry Institute—the first a sales course she completed before being hired by plaintiff and the other a course on graphic techniques which she completed a few weeks thereafter. Upon graduating from college, defendant took a job with Accujet Corporation, a wholesale envelope supplier, where she worked in production, purchasing and sales. During her nine-month employment there, she became familiar with between 10 and 20 of plaintiff's customers, having supplied plaintiff with envelopes for their orders.

She was not given the opportunity to review or negotiate the terms of the employment agreement, having signed it when Jack Reinhardt presented it to her the day she was hired, and although she did not feel it was fair, she voiced no objections to it. The training provided by plaintiff upon commencement of her employment consisted of (a) two days spent with Wyman making random sales calls to potential customers, at which she provided them with general information about plaintiff and a brochure listing the names of approximately 40 businesses which had purchased printing from it, and (b) several days visiting plaintiff's various departments observing sales and production methods, none of which were unique or even substantially different from those she observed at Accujet and Anchor Graphics. Immediately thereafter, she began making "cold calls" to businesses listed in the "Yellow Pages" and on the directories of downtown office buildings she canvassed. Her sales technique consisted of an initial visit to the potential customer's office to leave a business card and one of plaintiff's brochures, followed by a telephone call requesting an appointment at which she first attempted to establish personal rapport with the prospective buyer and then discussed plaintiff's services and displayed a sample book she had personally prepared. Afterward, she sent a thank-you letter and, if necessary, made additional telephone calls to procure an order. When a customer requested a price quotation, she submitted the job specifications to plaintiff's estimator who prepared an estimate for her use, showing a price breakdown from each department and her markup; it did not, however, contain "raw data," *i.e.*, the underlying cost figures used to arrive at those prices, nor did she ever know what those costs were. At first, she was paid a salary plus a 3% commission, but later, worked on a commission basis

only, earning $31,000 on gross sales of $400,000 in her second year with plaintiff. She did not know the identity of all of plaintiff's customers, although she acknowledged that she had access to the ledgers where that information was filed. Of the 76 firms listed on the list, she prepared as a receipt for the sales records she returned to plaintiff when she resigned, all but 17 were accounts she secured exclusively through her own efforts, and while she acknowledged thereafter calling on the customers she serviced while in plaintiff's employ, she added that at least 10 of them were also customers of Anchor Graphics before she started working there. Her decision to resign from plaintiff to work for Anchor Graphics was prompted by several considerations including plaintiff's relocation of its business and the attendant increase in expenses for which it refused to reimburse her, increasing customer complaints about plaintiff's prices, and a desire to expand her career opportunities by affiliating herself with a company having more advanced equipment and the capability to provide more services to its customers. Although she agreed that the knowledge she gained working for plaintiff was helpful in her new position, she maintained that it was of a general nature and could have been acquired elsewhere.

Gerald B. Kanne, the owner of another commercial printing company, testified that he has been in the printing business for 23 years; that it is a highly competitive field; that many of his customers also order printing from other printers; that information concerning the identity of a competitor's customers is easily obtainable simply by asking the customer; and that it is a common practice to do so.

Barbara Moriarity Kahn, a former employee of a brokerage firm and the person responsible for purchasing its printing, testified that over a period of four years, she placed orders with at least six or seven printers, including plaintiff; that salespersons frequently called on her and provided her with price quotations; that she chose a printer on the basis of the price quoted for a particular order and the service record of the printer submitting it. Because she was dissatisfied with plaintiff's service on an order for 1982 calendars, she purchased the 1983 calendars from another printer, but in late 1983 defendant contacted her and persuaded her to reorder from plaintiff in 1984 and 1985.

After argument by counsel, the trial court granted plaintiff's motion for an injunction restraining defendant from violating the terms of the employment agreement, but limited the noncompetition provision of the covenant to the 76 firms named on the list of customers solicited and/or serviced by defendant while she was in plaintiff's employ. This interlocutory appeal followed.

OPINION

■ It is fundamental that the party seeking a preliminary injunction must show by a preponderance of the evidence that (1) he or she possesses a clear right in need of protection; (2) there is no adequate remedy at law; (3) irreparable harm will result if it is not issued; (4) there is a likelihood of success on the merits. (*Cincinnati Tool Steel Co. v. Breed* (1985), 136 Ill. App. 3d 267, 482 N.E.2d 170; *Image Supplies, Inc. v. Hilmert* (1979), 71 Ill. App. 3d 710, 390 N.E.2d 68.) The decision to grant or deny preliminary injunctive relief rests within the sound discretion of the trial court, and because its findings may not be disturbed absent a showing of an abuse thereof, the role of a reviewing court is limited to determining whether those findings are contrary to the manifest weight of the evidence. *Instrumentalist Co. v. Band, Inc.* (1985), 134 Ill. App. 3d 884, 480 N.E.2d 1273; *Hayden's Sport Center, Inc. v. Johnson* (1982), 109 Ill. App. 3d 1140, 441 N.E.2d 927; *Hydroaire, Inc. v. Sager* (1981), 98 Ill. App. 3d 758, 424 N.E.2d 719.

■ The propriety of injunctive relief in the instant case depends upon the enforceability of the restrictive covenant at issue. The question is one of law (*American Claims Service, Ltd. v. Boris* (1985), 137 Ill. App. 3d 948, 485 N.E.2d 534; *J.D. Marshall International, Inc. v. Fradkin* (1980), 87 Ill. App. 3d 118, 409 N.E.2d 4), and because such covenants operate as partial restraints of trade, they are scrutinized carefully by the courts (*Hydroaire, Inc. v. Sager* (1981), 98 Ill. App. 3d 758, 424 N.E.2d 719). A restrictive covenant may be held enforceable only if the time and territorial limitations are reasonable and the restrictions are reasonably necessary to protect a legitimate business interest of the employer (*Morrison Metalweld Process Corp. v. Valent* (1981), 97 Ill. App. 3d 373, 422 N.E.2d 1034), a determination which necessarily turns on the facts and circumstances of each case (*Instrumentalist Co. v. Band, Inc.* (1985), 134 Ill. App. 3d 884, 480 N.E.2d 1273; *J.D. Marshall International, Inc. v. Fradkin* (1980), 87 Ill. App. 3d 118, 409 N.E.2d 4). Furthermore, plaintiff must show injury to its legitimate business interests separate and distinct from defendant's breach of the covenant to secure enforcement thereof; otherwise such covenant will be deemed an unenforceable attempt to prevent competition *per se. Hydroaire, Inc. v. Sager* (1981), 98 Ill. App. 3d 758, 424 N.E.2d 719; *Booth v. Greber* (1977), 48 Ill. App. 3d 213, 363 N.E.2d 6.

■ ■ Defendant first contends that plaintiff is not entitled to injunctive relief because it failed to establish the existence of a protectable business interest in its customers. While it is true that ordinarily an employer has no proprietary interest in its clients (*Packaging House, Inc. v. Hoffman* (1983), 114 Ill. App. 3d 284, 448 N.E.2d 947),

there are two general situations in which such an interest may be found for purposes of enforcing a covenant not to compete: (1) where, by the nature of the business, plaintiff has a near-permanent relationship with its customers and but for his or her employment, defendant would not have had contact with them; or (2) where the former employee learned trade secrets or acquired other confidential information while in plaintiff's employ and subsequently attempted to use it for his or her own benefit (*American Claims Service, Ltd. v. Boris* (1985), 137 Ill. App. 3d 948, 485 N.E.2d 534; *Morrison Metalweld Process Corp. v. Valent* (1981), 97 Ill. App. 3d 373, 422 N.E.2d 1034). Conversely, no such protectable interest is recognized where it is determined that the employer-customer relationship is short-term and no specialized knowledge or trade secrets have been acquired by or imparted to the employee (*American Claims Service, Ltd. v. Boris* (1985), 137 Ill. App. 3d 948, 485 N.E.2d 534; *Hydroaire, Inc. v. Sager* (1981), 98 Ill. App. 3d 758, 424 N.E.2d 719). Factors to be considered in determining whether a near-permanent relationship exists include the time, cost and difficulty involved in developing and maintaining the clientele, the parties' intention to remain affiliated for an indefinite period, and the continuity as well as the duration of the relationship. *McRand, Inc. v. van Beelen* (1985), 138 Ill. App. 3d 1045, 486 N.E.2d 1306.

Although plaintiff did not specifically allege in its complaint that the customers it sought to enjoin defendant from soliciting were near-permanent ones with whom she would not have had contact but for her association with it, it asserts that "almost half of the clients served by defendant were [its] former long-standing customers." We note, however, that the only evidence in this regard was presented on direct examination of James Reinhardt, plaintiff's president, who testified that "in some cases" the customer relationships were long-standing and stated that of the 25 firms he classified as "house accounts" or ones defendant was given company assistance in developing, "some" had done business with plaintiff for "five, six years" and one, "maybe ten years." In contrast, defendant testified that all but approximately 17 of the 76 accounts she serviced were ones whose business she solicited during her two years with plaintiff, having done so by making "cold calls" on firms whose names she obtained from sources such as the "Yellow Pages" and office building directories. In addition, Gerald Kanne, the owner of another commercial printing company, testified generally that the printing industry is highly competitive and that customers often do business with several printers—sometimes simultaneously—depending upon the nature of their printing needs. Further,

Barbara Moriarity Kahn, a former employee of one of the 25 firms identified by Reinhardt as one of plaintiff's "house accounts," testified specifically that during the four years she was responsible for purchasing her company's printing, she ordered from as many as six or seven different printers; that salespersons from numerous printing companies frequently called on her; and that in deciding from which to order, she considered a number of factors, including the specifications of the printing required, the various price quotations she received therefor and the past service records of the printers competing for the order. As to this last point, she added that she had ceased doing business with plaintiff for about one year because of her dissatisfaction with its service in preparing an order of 1982 calendars and that it was only due to defendant's persuasion that she resumed ordering from plaintiff in late 1983. In our view, defendant's evidence—which was largely uncontradicted by plaintiff—clearly establishes that the majority of the 76 firms she has been enjoined from contacting in her new position were short-term, impermanent customers whose business she was able to solicit not *because* of her association with plaintiff, but rather, through her own efforts on plaintiff's behalf and in furtherance of her association with it. See *Iroquois Industries Corp. v. Popik* (1980), 91 Ill. App. 3d 505, 415 N.E.2d 4.

Having so found, our inquiry then is whether the situation here is of the second type in which a protectable business interest is recognized, *i.e.*, the acquisition and subsequent attempted misuse by defendant of trade secrets or other confidential information. *Morrison Metalweld Process Corp. v. Valent* (1981), 97 Ill. App. 3d 373, 422 N.E.2d 1034.

■■ A "trade secret" has been defined in the decisional law of this State as "a plan or process, tool, mechanism, compound, or informational data utilized by a person in his business operations and known only to him and such limited other persons to whom it may be necessary to confide it" (*ILG Industries, Inc. v. Scott* (1971), 49 Ill. 2d 88, 92, 273 N.E.2d 393, 395), and it must relate to something held in secret or confidence and to the operations of a particular trade or business (*ILG Industries, Inc. v. Scott* (1971), 49 Ill. 2d 88, 273 N.E.2d 393). Information will not be considered a trade secret if it is generally known within an industry, or fully disclosed by the company through its own catalogs or literature which are disseminated throughout the industry or by the products themselves (*ILG Industries, Inc. v. Scott* (1971), 49 Ill. 2d 88, 273 N.E.2d 393; *Hayden's Sport Center, Inc. v. Johnson* (1982), 109 Ill. App. 3d 1140, 441 N.E.2d 927). The supreme court has delineated the factors to be considered in determining the

existence of a trade secret which include the extent to which the information is known outside of the business, as well as to employees and others involved in the business; the extent of measures taken to guard the secrecy of the information; the value of it to the employer and to his competitors; the amount of effort and/or money expended in developing the information; and the ease or difficulty with which it could be acquired or duplicated by others. *ILG Industries, Inc. v. Scott* (1971), 49 Ill. 2d 88, 93, 273 N.E.2d 393, 396, quoting Restatement of Torts sec. 757, comment b, at 6 (1939).

■ As we have previously stated, no business has a proprietary interest in its customers, although it may have such an interest in lists of customers it maintains. (*Image Supplies, Inc. v. Hilmert* (1979), 71 Ill. App. 3d 710, 390 N.E.2d 68.) Illinois courts have repeatedly held that customer lists and other customer information will be deemed a protectable trade secret only where the information has been developed by the employer over a number of years at great expense and kept under tight security. However, the same type of information is not protectable where it has not been treated as confidential and secret by the employer, was generally available to other employees and known by persons in the trade, could easily be duplicated by reference to telephone directories or industry publications, and where the customers on such lists did business with more than one company or otherwise changed businesses frequently so that their identities were known to the employer's competitors. *Lincoln Towers Insurance Agency v. Farrell* (1981), 99 Ill. App. 3d 353, 425 N.E.2d 1034; see *Charles P. Young Co. v. Leuser* (1985), 137 Ill. App. 3d 1044, 485 N.E.2d 541; *American Wheel & Engineering Co. v. Dana Molded Products, Inc.* (1985), 132 Ill. App. 3d 205, 476 N.E.2d 1291; *Cincinnati Tool Steel Co. v. Breed* (1985), 136 Ill. App. 3d 267, 482 N.E.2d 170; *Hayden's Sport Center, Inc. v. Johnson* (1982), 109 Ill. App. 3d 1140, 1146, 441 N.E.2d 927, citing *Lincoln Towers Insurance Agency v. Farrell* (1981), 99 Ill. App. 3d 353, 355, 425 N.E.2d 1034.

In this regard, plaintiff's complaint alleged that "over the years [it] has created and produced confidential information, data and systems for [its] exclusive use in connection with cost controls, customer lists, pricing and other confidential business information and methods of selling printed materials, all at great cost and expense," knowledge of which defendant acquired during the course of her employment and thereafter used for her and her new employer's benefit and to plaintiff's detriment.

■ We find, however, that these allegations are not supported by the record. For example, although plaintiff's complaint includes "cus-

tomer lists" among the items of confidential information it seeks to protect from disclosure by defendant, it presented no evidence that it had ever developed or maintained such lists; and while defendant did acknowledge on cross-examination that she had access to plaintiff's accounts receivable ledgers, she nevertheless maintained that she did not know the identity of all of plaintiff's customers, a point conceded by its president as probably true. Moreover, the fact that plaintiff itself published and distributed a promotional brochure listing 40 of its major customers refutes its claim that customer identities "were considered confidential information." Of additional significance on this issue was the testimony of Gerald Kanne, that due to the highly competitive nature of the commercial printing industry, customers often change printers or do business with more than one at a time so that their identities are generally known or, at least, easily ascertainable to competitors in the field. In any event, the injunction entered here was not directed to all of the accounts contained in plaintiff's files but, rather, only to those named in the list defendant prepared in the form of a receipt for records she returned to plaintiff upon her resignation. Testimony regarding that list established that between 66% (according to plaintiff's president) and 78% (according to defendant) of the 76 accounts named thereon were generated by defendant, without assistance from plaintiff, through "cold" or random calls on businesses whose names she obtained from public sources such as telephone and office building directories during the two years she worked for plaintiff, a fact demonstrating that the list she prepared could be readily duplicated by anyone in the field. She also testified that having sold envelopes to plaintiff in her previous employment with Accujet, she had prior knowledge of the identities of several of plaintiff's customers and that at least 10 had also been placing orders with Anchor Graphics before she began working there.

Likewise, it is our view that plaintiff failed to establish the existence of a protectable business interest in its sales techniques, pricing information or production methods. Although it presented evidence that defendant underwent a two-week training program to learn sales techniques and observe its various departments in operation, we note that she already possessed an undergraduate degree in marketing and nine months' experience in wholesale envelope purchasing and sales, had completed courses at the Printing Industry Institute in sales and graphic techniques—factors known to and considered by Jack Reinhardt in his decision to hire her—and that in the two days of field training with Wyman, she procured two orders and a request for a quotation on a third, all of which tend to refute plaintiff's assertion

that it devoted "a substantial amount of time, money and teaching" to her development as a salesperson.

Similarly, there is nothing in the record to suggest that plaintiff's equipment or production methods were technologically advanced or otherwise unique so as to constitute a protectable business interest. Indeed, defendant's testimony that there was nothing unusual about plaintiff's operations when compared to those she observed both at Accujet and Anchor Graphics was bolstered by James Reinhardt's own testimony that plaintiff does not have the in-house capability to do typesetting or produce multi-colored printing—as does Anchor Graphics—and that it specializes in small orders for one or two color materials.

Finally, with respect to defendant's knowledge of cost components and profit margins, we note again that prior to her employment defendant had worked, both in purchasing and sales, for a wholesale envelope supplier and thus, would likely have had some familiarity with supply costs. More important, however, was plaintiff's failure to demonstrate that the figures supplied to her by its estimator for her use in quoting the final cost of an order were of a more confidential nature than those traditionally, and necessarily, known by other salespersons in the industry; that they substantially differed from those of other small commercial printers or that they were not also available to its other employees. Moreover, defendant denied that she was given "raw data," or underlying costs, used in computing the estimates, stating that they were only general estimates of production costs and her allowable markup. In our view, the trial court's finding that plaintiff had established the existence of a protectable business interest warranting injunctive enforcement of the restrictive covenant was contrary to the manifest weight of the evidence. Having so found, we need not address defendant's alternate contentions that it was unreasonably broad in its geographic scope and thus void on its face or that the trial court improperly modified its terms so as to render it reasonable and thus, enforceable.

For the reasons stated, the order of the trial court granting plaintiff's motion for a preliminary injunction is reversed.

Reversed.

LORENZ and PINCHAM, JJ., concur.