PCx CORPORATION, d/b/a PC Distributing, Inc., Plaintiff-Appellant, v. RENE ROSS *et al.*, Defendants-Appellees.

First District (5th Division)   No. 87—2935

Opinion filed April 15, 1988.

1048

Bradley B. Falkof and Paula F. McKay, both of Griffin & Fadden, Ltd., of Chicago, for appellant.

Muscarello, Crisanti & Young, of Elgin, and Jeffrey L. Lawrence, of Kelley & Associates, of Schaumburg, for appellees.

JUSTICE SULLIVAN delivered the opinion of the court:

This is an interlocutory appeal pursuant to Supreme Court Rule 307(a)(1) (107 Ill. 2d R. 307(a)(1)) from the denial of a preliminary injunction to enforce a restrictive covenant in an employment contract.

Plaintiff PCx Corporation (PCx) filed a three-count complaint against defendants Rene Ross, a former employee, and Tech Data, Inc., Ross' current employer, for breach of a written noncompetition agreement, breach of fiduciary duties and tortious interference with the contract. In its petition for a temporary restraining order and

subsequent motion for a preliminary injunction PCx sought to enjoin Ross from violating the provisions of the agreement.

As alleged in the complaint, PCx, located in Northbrook, Illinois, is engaged in the business of distributing wholesale computer hardware products throughout the United States under the name PC Distributing, Inc. On October 3, 1986, PCx and Ross entered into an employment agreement which provided, in pertinent part:

"[Paragraph] 6. Restrictive Covenant.

a. Upon the termination of Employee's services under this Agreement for any reason whatsoever, Employee shall not directly or indirectly *** call on, solicit, or otherwise deal with any account or customer of the Employer with respect to any line of products or services represented by Employer at the time of termination. This restriction shall begin upon termination of Employee's services and continue for a period of twenty-four (24) months thereafter. ***

b. Employee further acknowledges that the foregoing restrictions placed upon [her] are necessary and that in the event that [her] services for the Employer should terminate for any reason, [she] will be in a position to earn a livelihood without violating the foregoing restrictions, and that i[t] has been made clear to [her] on behalf of the Employer that [her] ability to earn a livelihood without violating such restrictions is a material condition to the Employer entering into this Agreement.

7. Disclosure of Information.

a. Employee recognizes and acknowledges that all knowledge and information which [she] may acquire in the course of [her] relationship hereunder relating to the business, developments, activities, or products of the Employer or the business or financial affairs of any individual or firm doing business with the Employer, such as, but not limited to, customer and supplier lists, cost and selling prices for specific customers, customers' needs and requirements, confidential data regarding marketing sources and product designs, and other information, ideas, discoveries, creations, developments, improvements, designs and processes so acquired are the valuable property of the Employer and shall be held by the Employee in confidence and trust for the sole benefit of the Employer.

b. The Employee agrees not to disclose, divulge or publish, without the prior written consent of the Employer, either during the term of [her] employment or at any time subsequent thereto, knowledge of any confidential information concerning

the Employer's business, developments, products or activities, or the business affairs of any individual or firm doing business with the Employer that may be acquired by the Employee.

c. Upon the termination of [her] services hereunder, for whatever reason, the Employee agrees that [she] will not take with [her] any records of any kind pertaining to sales, customers, suppliers, or any other information, involving or affecting the Employer, or any drawings, samples, papers, blueprints, models, charges, bulletins or reports of any kind, obtained, prepared or used by the Employee or anyone else during and in connection with [her] services hereunder.

d. The parties both recognize and acknowledge that the services of Employee are special and unique, and that, by reason of this Agreement, Employee is obtaining access to confidential information and other material as aforesaid. Therefore, Employee expressly agrees that any breach or threatened breach of the provisions of either paragraph (6) or (7) hereof shall entitle the Employer, in addition to any other legal remedies available to it, to apply to any court for an injunction, temporary and/or permanent, to prevent any violation of this Agreement, and Employee recognizes, acknowledges and concedes that such injunction would, in those circumstances be necessary to protect the Employer's interests."

In its complaint, PCx further alleged that since the inception of its business, it has devoted substantial amounts of time, effort and money to gather and compile information relating to the development of its customer and supplier lists, purchasing costs, selling prices, customer needs and requirements, sales strategies, marketing sources and product design, none of which can be easily duplicated or reproduced; that its practice has been to take precautionary measures to preserve the confidentiality of such information; that although it is engaged in a highly competitive, technologically advancing business, it has developed a base of well-established regular customers; and that but for her employment with PCx, Ross would not have become privy to this information or come into contact with those customers.

Ross voluntarily terminated her employment with PCx on July 8, 1987, and shortly thereafter accepted a position as a sales representative for Tech Data. It is alleged by PCx that in the course of her employment therewith, Ross has violated and continues to violate the above-quoted provisions of the employment agreement in that she has disclosed to Tech Data and used, for its and her own benefit, confidential and proprietary information acquired during her employment

with PCx and has called on and solicited customers of PCx for the purpose of selling the same lines of products and services sold by PCx; that as a proximate result of her breach of the employment contract, it has suffered irreparable injury to its reputation and goodwill and has lost and will continue to lose its competitive advantage in the industry and its well-established customer base—injuries for which there is no adequate remedy at law. PCx therefore sought an injunction restraining Ross, for a period of 24 months, from (1) calling on, soliciting or selling competitive products or services to customers whom she called on, solicited, sold such products to or became acquainted with during and as a result of her employment with it or (2) disclosing any of the proprietary information concerning its business, products, or activities or the business affairs of firms doing business with it.

Ross and Tech Data filed an answer and affirmative defenses, asserting that PCx does not possess a protectable business interest in its customers justifying restriction of Ross' employment because (1) the identity of the customers on PCx's customer list is readily ascertainable from the "Yellow Pages" and from various business directories listing retail computer dealers and consultants; (2) that no attempt was made to restrict circulation of the customer list to only officers or "trusted" employees of PCx, the list having been distributed to almost all PCx employees without any warning as to its alleged confidential nature; (3) that the product lines offered by PCx and Tech Data are only partially the same and that the sales generated by Ross in product lines also offered by PCx is and will continue to be negligible; (4) that the wholesale computer peripherals industry is so highly competitive in terms of price and availability of products as to negate any claim of a "well-established, regular customer base"; and (5) that the noncompetition provisions in the employment agreement are unenforceable because they are excessively broad in both time and geographic scope.

At a hearing on August 31, 1987, Robert Curley, the chairman of the board of PCx, testified that PCx was formed in late 1982 and shortly thereafter commenced doing business as a distributor of computers and computer hardware peripherals, such as printers, plotters, modems, video boards, tape drives, cables and other similar items which are displayed in a catalog prepared and distributed by PCx, a copy of which was admitted as an exhibit. PCx purchases the products from manufacturers which do not have direct sales forces and then sells them to retail dealers, such as Computerland, and "value-added resellers"—specialist dealers who increase the value of the

products by adding software to create specific computer systems for resale to the ultimate users, the latter comprising approximately 55% of its business. PCx maintains a list, which is divided into territories of the country, of the named of customers with which it has been doing business over the course of its existence, the preponderance of which are within the Great Lakes region. While its mailings usually number about 7,000, the customer list—which is periodically revised to add new customers and delete the names of those no longer doing business with PCx or whose purchases do not meet a minimum dollar amount—consists of approximately 4,000 names. Sales are made by approximately 10 to 15 professional consultants who are trained in the use of computer peripherals by PCx's vendors and suppliers at weekly evening sessions as well as by members of PCx's internal staff. Although the consultants occasionally make personal visits to the customers, most transactions are conducted over the telephone.

It is an absolute condition of employment that each new salesperson sign an employment agreement; and after Ross signed the one at issue, she was given a copy of the customer list. It is also the policy of PCx to hold an "exit interview" with a departing employee—usually conducted by Jeremy Smith, the president of PCx—to review the respective obligations of PCx and the employee, including those set out in the employment agreement. Although he did not attend any such interview with Ross, he did have a brief conversation with her before she left in which he inquired as to her future plans. She responded that she did not know but that she would not "do anything to hurt [PCx]."

Curley further testified that Tech Data, a public corporation organized in Florida, is a direct competitor of PCx in that it is engaged in the business of selling, on a nationwide basis, the same computer products as those sold by PCx, using primarily the same marketing technique of telephone contacts. When Tech Data first opened its Chicago-area branch in mid-1986, it was used merely as a distribution center for orders taken in Florida, but sometime thereafter it became a sales office. He subsequently learned, through another PCx salesperson and Jeremy Smith, that Ross was employed as a salesperson for Tech Data and that she was contacting customers of PCx. This was corroborated, he stated, by the sudden, marked increase in requests by Tech Data for credit information on various customers.

On cross-examination, Curley stated that the 18 customers named on a list prepared by and included in the affidavit of Jeremy Smith were PCx customers either contacted by Ross and/or about whom Tech Data requested credit information after Ross was hired thereby.

Had the companies thereon been existing customers of Tech Data it would not require such information. Curley further stated that the "lines of products" to which the restrictive covenant was directed referred not to specific name brands supplied by specific vendors but to generic types of computer peripherals such as printers, modems and the like. Curley identified a letter sent to Ross by its attorney calling her attention to the terms of the employment agreement and her violation of them and stating that suit would be filed against her if she did not cease her employment with Tech Data within five days of her receipt thereof.

On re–direct-examination, Curley testified that alternative employment possibilities for former PCx employees which would not conflict with the terms of the restrictive covenant include employment with vendors, including those which supply the products resold by PCx, with retail dealers to whom PCx sells its line of products, or in sales of products not sold by PCx. The reason PCx requires its employees to sign a restrictive covenant as a condition of employment is because the heart of the business is, and the survival of PCx depends upon the retention of the business of, those customers it has generated and developed over the years.

Ross testified as an adverse witness, that she began her employment with Tech Data on July 13, 1987. She identified the employment agreement she signed on October 3, 1986, and acknowledged that she understood that the noncompetition covenant therein restricted her ability to accept certain types of jobs for a period of 24 months after leaving the employ of PCx and that in the course of her employment she would be given a customer list to be used to contact customers, make sales and thereby earn commissions. Although she had previously compiled her own customer list, it was of no value to her or PCx because it did not relate to her territory at PCx.

During her employment with PCx, she attended seminars conducted by various vendors/suppliers regarding the products and their compatibility and was given a list of PCx's customers, information regarding their past purchase records and credit ratings, and the names of persons to contact when soliciting an order. She acknowledged that in the course of her employment with Tech Data she had contacted and made sales presentations to certain names customers of PCx regarding products sold by both Tech Data and PCx, but stated that she had not yet made any sales; she later recalled, however, that she had written a purchase order for one of PCx's customers. Although at the time she signed the agreement, she understood that she would be restricted in her sales of certain lines of products, she did not under-

stand "lines of products" to mean the types of products sold by PCx. She further stated that in making presentations to potential customers, she attempted to avoid sales of products supplied by 22 of the vendors common to Tech Data and PCx, concentrating instead on the products supplied by the 27 other vendors which were sold by Tech Data but not by PCx. She does not, however, advise potential customers that she is restricted in the type of product she is able to sell; rather, she presents them with a Tech Data catalog containing a full line of products from more than 40 different vendors.

Defense counsel waived cross-examination of Ross, requesting allowance to recall and conduct direct examination of her as a defense witness. However, following admission of the exhibits presented by PCx, defense counsel moved to dismiss the petition for a temporary restraining order and to deny the motion for a preliminary injunction on the grounds that PCx had failed to present sufficient evidence of a proprietary interest in its customers, misappropriation of confidential information or that it suffered any type of irreparable injury as to make out a *prima facie* case in support of its request for injunctive relief. Following a brief response by counsel for PCx, the trial court stated that "[t]he restriction is too broad in scope and will not be enforced by this Court." The court expressed its belief that PCx did not have "even a fair chance of sustaining the matter on the merits," and concluded that the covenant was "overly broad *** [t]he geographic scope is too broad in the first place," in denying PCx's motion for a preliminary injunction. This appeal followed.

OPINION

■■ ■ It is well settled that the party seeking a preliminary injunction must show that (1) he possesses a clear right or interest needing protection; (2) there is no adequate remedy at law; (3) irreparable harm will result if the injunction is not issued; and (4) there is a reasonable likelihood of success on the merits. (*A. B. Dick Co. v. American Pro-Tech* (1987), 159 Ill. App. 3d 786, 514 N.E.2d 45; *Reinhardt Printing Co. v. Feld* (1986), 142 Ill. App. 3d 9, 490 N.E.2d 132; *McRand, Inc. v. van Beelen* (1985), 138 Ill. App. 3d 1045, 486 N.E.2d 1306; *Instrumentalist Co. v. Band, Inc.* (1985), 134 Ill. App. 3d 884, 480 N.E.2d 1273; *Morrison Metalweld Process Corp. v. Valent* (1981), 97 Ill. App. 3d 373, 422 N.E.2d 1034.) In the last regard, all that is required of the petitioning party at the preliminary injunction stage of proceedings is that he raise a fair question as to the existence of the right claimed (*Hayden's Sport Center, Inc. v. Johnson* (1982), 109 Ill. App. 3d 1140, 441 N.E.2d 927) and demonstrate that

he will probably be entitled to the relief requested if the evidence sustains the allegations (*Instrumentalist Co. v. Band, Inc.* (1985), 134 Ill. App. 3d 884, 480 N.E.2d 1273; *The Packaging House, Inc. v. Hoffman* (1983), 114 Ill. App. 3d 284, 448 N.E.2d 947). The decision to grant or deny preliminary injunctive relief rests within the sound discretion of the trial court and, thus, the role of a reviewing court is limited to a determination of whether the findings of the trial court are contrary to the manifest weight of the evidence. *McRand, Inc. v. van Beelen* (1985), 138 Ill. App. 3d 1045, 486 N.E.2d 1306; *Reinhardt Printing Co. v. Feld* (1986), 142 Ill. App. 3d 9, 490 N.E.2d 132; *Hydroaire, Inc. v. Sager* (1981), 98 Ill. App. 3d 758, 424 N.E.2d 719; *Booth v. Greber* (1977), 48 Ill. App. 3d 213, 363 N.E.2d 6.

■■■ The propriety of injunctive relief in this case depends upon the enforceability of the restrictive covenant. The question of its enforceability is a matter of law (*Instrumentalist Co. v. Band, Inc.* (1985), 134 Ill. App. 3d 884, 480 N.E.2d 1273) and depends upon the reasonableness of its terms (*McRand, Inc. v. van Beelen* (1985), 138 Ill. App. 3d 1045, 486 N.E.2d 1306; *Tower Oil & Technology Co. v. Buckley* (1981), 99 Ill. App. 3d 637, 425 N.E.2d 1060). Because covenants not to compete operate, in a sense, as partial restraints of trade, they are scrutinized carefully by the courts to ensure that their intended effect is not the preclusion of competition *per se.* (*Instrumentalist Co. v. Band, Inc.* (1985), 134 Ill. App. 3d 884, 480 N.E.2d 1273; *Hydroaire, Inc. v. Sager* (1981), 98 Ill. App. 3d 758, 424 N.E.2d 719; *Booth v. Greber* (1977), 48 Ill. App. 3d 213, 363 N.E.2d 6.) However, where a party voluntarily enters into a contract to refrain from competing with an employer following termination of the employment relationship in exchange for certain benefits (*Morrison Metalweld Process Corp. v. Valent* (1981), 97 Ill. App. 3d 373, 422 N.E.2d 1034), and the time and territorial limitations of the covenant (*Tower Oil & Technology Co. v. Buckley* (1981), 99 Ill. App. 3d 637, 425 N.E.2d 1060), as well as its effect on the parties and the public, are not unreasonable (*Morrison Metalweld Process Corp. v. Valent* (1981), 97 Ill. App. 3d 373, 422 N.E.2d 1034), enforcement by injunction is customary and appropriate (*Canfield v. Spear* (1969), 44 Ill. 2d 49, 254 N.E.2d 433; *Instrumentalist Co. v. Band, Inc.* (1985), 134 Ill. App. 3d 884, 480 N.E.2d 1273). In other words, the basic test applied by Illinois courts is whether the terms of the agreement are reasonable and necessary to protect a legitimate business interest of the employer (*McRand, Inc. v. van Beelen* (1985), 138 Ill. App. 3d 1045, 486 N.E.2d 1306; *Reinhardt Printing Co. v. Feld* (1986), 142 Ill. App. 3d 9, 490 N.E.2d 132), a determination which necessarily turns on the facts and

circumstances of each case (*A. B. Dick Co. v. American Pro-Tech* (1987), 159 Ill. App. 3d 786, 514 N.E.2d 45; *J. D. Marshall International, Inc. v. Fradkin* (1980), 87 Ill. App. 3d 118, 409 N.E.2d 4).

■ Although not every alleged business interest will be deemed legally protectable, or "proprietary" for purposes of enforcing a covenant not to compete (*Reinhardt Printing Co. v. Feld* (1985), 142 Ill. App. 3d 9, 490 N.E.2d 132; *Image Supplies, Inc. v. Hilmert* (1979), 71 Ill. App. 3d 710, 390 N.E.2d 68), this court has repeatedly recognized two general situations in which such an interest may exist: (1) where the former employee acquired trade secrets or other confidential information through and in the course of his employment and subsequently attempted to use it for his own benefit (*ILG Industries, Inc. v. Scott* (1971), 49 Ill. 2d 88, 273 N.E.2d 393); and (2) where, by the nature of the business, the customer relationship is near-permanent and but for his association with the employer, the former employee would not have had contact with the customers (*Instrumentalist Co. v. Band, Inc.* (1985), 134 Ill. App. 3d 884, 480 N.E.2d 1273; *Morrison Metalweld Process Corp. v. Valent* (1981), 97 Ill. App. 3d 373, 422 N.E.2d 1034).

PCx does not allege the misappropriation by Ross of trade secrets or confidential information, such as formulae developed by the employer (see, *ILG Industries v. Scott* (1971), 49 Ill. 2d 88, 273 N.E.2d 393), or lists, reports and the like which are kept under lock and key and made available only to a limited number of key employees; rather, it bases its claim for an injunction on the second type of situation, the purported existence of a proprietary business interest in near-permanent customers, with whom Ross would not have had contact but for her employment with it.

■ Objective factors to be considered in determining, first, whether a near-permanent relationship exists include the amount of time, expense and effort invested by the employer in developing and maintaining its clientele; the amount and frequency of personal contact by the employer with the customers; the extent of the employer's knowledge of the customers' buying habits as well as their current and future business needs and requirements; and the continuity and duration of the business relationships in relation to the length of time the employer has been in business. (*McRand, Inc. v. van Beelen* (1985), 138 Ill. App. 3d 1045, 486 N.E.2d 1306.) Assuming that the evidence demonstrates a near-permanent business relationship, the employer must then show that but for the employment association, the employee would not have had contact with those customers. *McRand, Inc. v. van Beelen* (1985), 138 Ill. App. 3d 1045, 486 N.E.2d 1306.

■ Applying this analysis to the case at bar, we believe that PCx presented sufficient evidence of the factors indicative of a near-permanent relationship with its customers and that but for her employment Ross would not have had contact with them to raise a fair question as to the existence of a legitimate right in need of protection. Having already set forth that evidence in detail, we will not engage in another lengthy review of it. We note, in summary fashion, however, that the chairman of PCx testified that the computer hardware industry is constantly advancing and highly competitive and that the survival of the company depends on maintaining business relations with the clientele PCx personnel have worked to acquire and cultivate throughout the five years of the company's existence. In order to generate new business and satisfactorily service existing customers, it is necessary that the sales consultants possess specialized knowledge as to the types, use and compatibility of the lines of products offered by PCx as well as the product needs, past purchase records and future plans of the customers. PCx salespersons are, therefore, provided with training in weekly evening sessions by suppliers of the equipment and by other in-house personnel. Approximately 10 to 15 salespersons are responsible for maintaining personal contact with the customers, primarily by telephone, although personal visits are also made on occasion. Those customers who do business with PCx on a regular basis are retained on the list; customers who cease doing business with PCx or whose orders fall below a minimum monetary amount are deleted from the list in periodic updates of it. Finally, it is a condition of employment that each new salesperson sign the agreement containing the restrictive covenant specifically prohibiting the solicitation of customers whose names, purchase and credit histories are maintained on that list; and that upon termination, voluntary or otherwise, of the employee an "exit interview" is conducted for the purpose, in part, of reviewing the employee's rights and obligations thereunder.

Ross corroborated, on adverse examination, that she understood that the employment agreement contained a noncompetition covenant restricting her employment activities in the computer hardware field for two years following termination of her association with PCx; that she received the training described by Curley and was given a list of PCx customers containing information regarding their past purchase records, credit ratings and the names of individuals to contact when soliciting an order; that it was that list she used—her own being of no relevance to her employment with PCx—in making sales while working for PCx; and that she had solicited and made sales presentations

to some of those same customers regarding the same lines of products sold by PCx in the course of her employment as a salesperson for Tech Data.

■ We further note that in arguments before us, defendants conceded that because PCx and Tech Data both distribute their products on a nationwide basis, the absence of a geographic limitation in the covenant does not, as the trial court suggested, render it excessively broad; nor do they contest the reasonability of its two-year duration, a term which has been upheld in numerous of the cases cited throughout our decision wherein the agreement was in all other respects found to be enforceable. In any event, case law supports PCx's assertion that a territorial limitation is not required in activity covenants designed not to prevent competition but to protect the employer's relationships with its customers (*McRand, Inc. v. van Beelen* (1985), 138 Ill. App. 3d 1045, 486 N.E.2d 1306; *J. D. Marshall International, Inc. v. Fradkin* (1980), 87 Ill. App. 3d 118, 409 N.E.2d 4).

■ On the basis of the evidence in the record before us, we are of the opinion that PCx has established that violation of the covenant by Ross has resulted and will continue to result in irreparable injury for which money damages are inadequate and that it logically follows from the above findings that there is a reasonable likelihood of PCx prevailing on the merits. Thus, we find that the trial court abused its discretion in dismissing the complaint and denying the motion for a preliminary injunction at the close of PCx's case.

For the reasons stated, the order of the trial court is reversed and this cause is remanded for further proceedings not inconsistent with the opinions expressed herein.

Reversed and remanded.

PINCHAM and MURRAY, JJ., concur.