PCx CORPORATION, d/b/a PC Distributing, Inc., Plaintiff-Appellant, v. RENE ROSS *et al.*, Defendants-Appellees.

First District (5th Division)   No. 1—89—0709

Opinion filed February 1, 1991.

Bradley B. Falkof, of Griffin & Fadden, Ltd., of Chicago, for appellant.

Jeffrey Lawrence, of Schaumburg, and Muscarello, Crisanti & Young, of Elgin, for appellees.

JUSTICE GORDON delivered the opinion of the court:

This is an appeal from a trial court order, upon remand, enjoining defendants Rene Ross (hereinafter Ross), a former employee of plaintiff, PCx Corporation, and Tech Data, Inc. (hereinafter Tech Data), plaintiff's competitor and Ross' new employer, from doing any business with six of plaintiff's customers with respect to the "line of products" carried by plaintiff as of July 8, 1987, for a period of 24 months. Plaintiff contends that the trial court erred: (1) in limiting injunctive relief to only six of its customers and (2) in denying an award of punitive damages against Tech Data. On cross-appeal, defendants contend that the trial court erred: (1) in granting injunctive relief for any of the six customers and (2) in determining that the term "line of products" referred to generic items of computer hardware as opposed to the products of a specific manufacturer. We affirm the trial court.

The current dispute involves two provisions of an employment agreement entered into by Ross when she went to work as a sales consultant for plaintiff, a regional distributor of computer hardware products, in October of 1986. Those provisions stated, in pertinent part:

"[Paragraph] 6. Restrictive Covenant.

a. Upon the termination of Employee's services under this Agreement for any reason whatsoever, Employee shall not directly or indirectly *** call on, solicit, or otherwise deal with any account or customer of the Employer with respect to any *line of products* or services represented by Employer at the time of termination. This restriction shall begin upon termination of Employee's services and continue for a period of twenty-four (24) months thereafter. ***

* * *

7. Disclosure of Information.

a. Employee recognizes and acknowledges that all knowledge and information which [she] may acquire in the course of [her]

relationship hereunder relating to the business, developments, activities, or products of the Employer or the business or financial affairs of any individual or firm doing business with the Employer, such as, but not limited to, customer and supplier lists, cost and selling prices for specific customers, customers' needs and requirements, confidential data regarding marketing sources and product designs, and other information, ideas, discoveries, creations, developments, improvements, designs and processes so acquired are the valuable property of the Employer and shall be held by the Employee in confidence and trust for the sole benefit of the Employer.

 b. The Employee agrees not to disclose, divulge or publish, without the prior written consent of the Employer, either during the term of [her] employment or at any time subsequent thereto, knowledge of any confidential information concerning the Employer's business, developments, products or activities, or the business affairs of any individual or firm doing business with the Employer that may be acquired by the Employee." (Emphasis added.)

The dispute arose when Ross resigned from her sales consultant position with plaintiff in July of 1987 to take a sales position with Tech Data, one of plaintiff's competitors, and immediately began contacting many of plaintiff's customers for Tech Data.

After informal attempts at resolving the dispute failed, plaintiff filed a three-count complaint for injunctive and other relief against Ross and Tech Data claiming a breach of the noncompetition agreement, breach of fiduciary duties and tortious interference with the contract. In support of the request for an injunction, plaintiff alleged that Ross breached the terms of the above-stated provisions of her employment agreement by disclosing to Tech Data and using confidential and proprietary information acquired during her employment with plaintiff and by calling on and soliciting plaintiff's customers for the purpose of selling the same line of products and services sold by plaintiff. After an initial hearing on plaintiff's motion for preliminary injunction, the trial court entered an order dismissing the complaint and denying the motion, finding that "[t]he restriction [contained in the restrictive covenant] is too broad in scope and will not be enforced by the Court."

Thereafter, plaintiff filed an interlocutory appeal of that order pursuant to Supreme Court Rule 307(a)(1) (107 Ill. 2d R. 307(a)(1)) and the matter was assigned to our division of the appellate court. In *PCx Corp. v. Ross* (1988), 168 Ill. App. 3d 1047, 522 N.E.2d 1333, we reversed the trial court's order, finding sufficient evidence to support granting a pre-

liminary injunction against Ross and Tech Data. In so doing, we specifically found that plaintiff "presented sufficient evidence of the factors indicative of a near-permanent relationship with its customers and that but for her employment [by plaintiff] Ross would not have had contact with them [so as] to raise a fair question as to the existence of a legitimate right in need of protection." (*PCx Corp. v. Ross* (1988), 168 Ill. App. 3d 1047, 1058, 522 N.E.2d 1333, 1340.) We remanded this matter to the trial court for "further proceedings not inconsistent" with our opinion. 168 Ill. App. 3d at 1059, 522 N.E.2d at 1341.

PROCEEDING ON REMAND

Upon remand, the trial court conducted a second full hearing on plaintiff's motion for preliminary injunction. Much of the evidence presented was the same as at the initial hearing and as summarized in the initial appeal (*PCx Corp. v. Ross*, 168 Ill. App. 3d at 1052-55, 522 N.E. 2d at 1336-38) and will not be restated except to the extent that it relates to the issues raised.

The undisputed evidence showed that Ross was hired as a "sales consultant" for plaintiff in October of 1986 and was assigned a sales territory which encompassed areas south and west of the City of Chicago. At the time of her hire, she signed the aforementioned employment contract as a condition of her employment and thereafter was given the portion of plaintiff's customer list which related to her territory. According to the testimony of Robert Curley, plaintiff's chairman of the board, the list was confidential and had been compiled at great expense since plaintiff's inception in 1982 and contained valuable customer information necessary for the survival of the company. Curley stated that the customer information list included such information as the names, addresses, contact persons, credit information, and product needs of the individual customers.

Though it was generally conceded that Ross' sales consultant position with plaintiff was mostly one that involved her only in telephone communications with customers, there was nevertheless a dispute over the nature of her relationship with those customers. Ross testified that she was essentially an "order taker." Robert Curley and Steven Rosenthal, plaintiff's sales manager, however, testified that the relationship was much more than just that. According to Curley, because of plaintiff's sales strategy to service and build existing accounts, plaintiff's sales consultants were the "linch pin" of that strategy. He stated that consultants were extensively trained by plaintiff and its vendors to provide product capability, availability, compatibility and other technical information to customers. He explained the role of the consultants by stat-

ing that they were the "value added" difference between plaintiff and its competitors. Rosenthal corroborated the extensive training given sales consultants and further stated that they were the employees primarily responsible for maintaining plaintiff's good will with its customers.

The undisputed evidence shows that on July 8, 1987, Ross ended her employment with plaintiff. Though it was plaintiff's policy to conduct an "exit interview" with an employee prior to his or her final date, it apparently did not conduct such an interview with Ross. Furthermore, at the time of her termination, she was not advised or given a list of specific plaintiff's customers she could not call on, solicit or otherwise deal with in the 24 months following her termination.

On July 13, 1987, five days after Ross' termination of her employment with plaintiff, she began working as an outside sales representative for Tech Data, a national distributor of computer hardware products, and was assigned a territory encompassing Chicago and its Northwest suburbs. There is a disparity in the evidence as to when Ross "accepted" the offer of employment with Tech Data, with Ross testifying that she did not accept the offer until her first day of work on July 13 and Steven Raymund, Tech Data's president, and Mark Bennett, Tech Data's regional sales manager, seemingly testifying that the offer had been orally accepted before that date. However, this disparity is of no apparent consequence since there was no evidence offered that Ross did anything during any period prior to her last day of work with plaintiff in breach of the employment contract.

It is undisputed that Ross first advised Mark Bennett, Tech Data's regional sales manager, of the terms of her employment agreement with plaintiff either shortly before or after she began working for Tech Data. Thereafter, Bennett, after consulting with Steven Raymund, Tech Data's president, advised Ross that he still believed that she could make a contribution to Tech Data. To avoid any conflict with that agreement, however, he advised Ross to (1) concentrate her efforts on only existing Tech Data accounts, as listed on the Tech Data customer list, (2) work only in areas other than those she had worked for plaintiff, and (3) emphasize the sale of products other than those she previously sold for plaintiff. Notwithstanding these guidelines, there was only minimal follow-up by Tech Data personnel to monitor Ross' compliance with them.

The undisputed evidence shows that almost immediately upon commencing employment with Tech Data, Ross began calling on plaintiff's current customers, some located in the territory assigned to Ross by the plaintiff when she was in its employ and others located elsewhere

in Illinois, and subsequently many of these customers purchased products of the same generic type from Tech Data as Ross previously sold for plaintiff. It further shows that soon after Ross' employment by Tech Data, plaintiff began receiving a significant increase in "credit inquiries" by Tech Data regarding plaintiff's customers. These increased credit inquiries which were logged by one of plaintiff's employees, the records of which were admitted into evidence, indicated that Tech Data was in the initial stages of selling products to these customers. Also, during the first year of Ross' employment with Tech Data, Tech Data nearly doubled the number of customers on its Illinois customer list who were also on plaintiff's customer list.

The undisputed evidence also indicates that of the 515 customers in Ross' Tech Data territory, 158 were also customers of the plaintiff. Nonetheless, documentary evidence presented by defendants, including exhibits which showed the dates when these customers commenced doing business with Tech Data and Tech Data's resellers profiles which showed when Ross first visited these customers, demonstrated that of these 158, only five, Evcor, HEI, Heath Zenith (Downers Grove), ICOM-Lombard, and Imprint Enterprises, were located in the territory assigned to Ross when she worked for plaintiff and not already also Tech Data's customer at the time Ross first contacted them. These exhibits showed that Ross first contacted Evcor on November 11, 1987, and Tech Data began doing business with it on February 8, 1988; first contacted HEI on December 4, 1987, and Tech Data began doing business with it on February 2, 1988; first contacted Heath Zenith (Downers Grove) on October 28, 1987, and Tech Data began doing business with it on November 16, 1987; first contacted ICOM-Lombard on November 24, 1987, and Tech Data began doing business with it on November 25, 1987; and first contacted Imprint Enterprises on March 11, 1988, and Tech Data began doing business with it on April 13, 1988. Additionally, these same documents showed that one customer of Tech Data, PC Point, had done merely $93 worth of business with Tech Data before Ross first contacted them, as compared to $37,000 in the previous year with plaintiff.

On the basis of this evidence, the trial court found that but for Ross' employment with plaintiff, she would not have had contact with six customers, PC Point, Evcor, HEI, Heath Zenith (Downers Grove), ICOM-Lombard and Imprint Enterprises, and that plaintiff had a near-permanent relationship with these customers. It found no evidence, however, that Ross had misapplied, misused or misappropriated trade secrets. It enjoined Ross and Tech Data from doing business with any of those six customers with respect to all lines of products, which it

defined in its order as "general categories of products," carried by plaintiff as of July 8, 1987, for a period of 24 months. It directed Tech Data to supply to plaintiff an accounting of all sales and all gross profits earned from these customers from July 13, 1987, Ross' first day with Tech Data, to the date of its order and directed Tech Data to pay said gross profits to plaintiff. It further specifically denied plaintiff's request for punitive damages and all other relief requested.

OPINION

Plaintiff first contends that the trial court erred in limiting the injunction to six customers. Plaintiff argues that the evidence clearly shows that Ross contacted far more than these six customers and Tech Data first began doing business with far more than six of its customers after she commenced employment with Tech Data.

■■■ As noted in our earlier decision in this matter:

"Although not every alleged business interest will be deemed legally protectable, or 'proprietary' for purposes of enforcing a covenant not to compete (*Reinhardt Printing Co. v. Feld* (1985), 142 Ill. App. 3d 9, 490 N.E.2d 132; *Image Supplies, Inc. v. Hilmert* (1979), 71 Ill. App. 3d 710, 390 N.E.2d 68), this court has repeatedly recognized two general situations in which such an interest may exist: (1) where the former employee acquired trade secrets or other confidential information through and in the course of his employment and subsequently attempted to use it for his own benefit (*ILG Industries, Inc. v. Scott* (1971), 49 Ill. 2d 88, 273 N.E.2d 393); and (2) where, by the nature of the business, the customer relationship is near-permanent and but for his association with the employer, the former employee would not have had contact with the customers (*Instrumentalist Co. v. Band, Inc.* (1985), 134 Ill. App. 3d 884, 480 N.E.2d 1273; *Morrison Metalweld Process Corp. v. Valent* (1981), 97 Ill. App. 3d 373, 422 N.E.2d 1034)." (*PCx Corp. v. Ross* (1988), 168 Ill. App. 3d 1047, 1057, 522 N.E.2d 1333, 1339.)

In that decision, we found that an injunction was appropriate in the present case based on sufficient evidence that plaintiff had a near-permanent relationship with its customers and that but for Ross' employment with plaintiff, she would not have had contact with them. Upon remand, the trial court heard further evidence and concluded, based on that additional evidence, that the injunction, which we deemed warranted in the first appeal, would extend to six customers of plaintiff. In reviewing that decision, we note that the question of the issuance of a preliminary injunction is addressed to the discretion of the trial court

and our role on review of the court's finding is limited to a determination of whether that finding was against the manifest weight of the evidence. (*A.B. Dick Co. v. American Pro-Tech* (1987), 159 Ill. App. 3d 786, 791-92, 514 N.E.2d 45, 48.) We find the trial court's decision to limit the injunction to six customers is supported by the manifest weight of the evidence in this case and therefore will not reverse it. See *Reinhardt Printing Co. v. Feld* (1986), 142 Ill. App. 3d 9, 490 N.E.2d 1302.

The evidence presented on remand in this case sufficiently demonstrates that of the many customers of plaintiff whom Ross contacted and who thereafter purchased products from Tech Data, only five were located in her old territory and were not already Tech Data's customers when the contact was made. This fact was demonstrated by the exhibits showing the customers' respective starting dates with Tech Data and the resellers profiles showing the date of Ross' visits. Arguably these were the only customers whom Ross would not have contacted "but for" her previous employment with plaintiff. Application of the injunction only to these customers was therefore within the trial court's discretion. It would have been reasonable for the trial court to conclude that all other customers were contacted by Ross because they were already customers of Tech Data and not because she learned of them as a result of her prior relationship with plaintiff. Furthermore, though it is true that the sixth customer affected by the injunction, PC Point, was Tech Data's customer prior to Ross' initial contact, having commenced doing business with Tech Data about two weeks before Ross' first day at Tech Data, we find that the amount of business was so minimal ($93) when compared to the substantial amount of its business with plaintiff in the year prior to Ross' termination ($37,000) that it was within the trial court's range of discretion to conclude that Ross would not have contacted PC Point but for her previous employment.

■■ Plaintiff argues that the injunction should have been extended to all of its customers who were initially sold products by Tech Data after Tech Data employed Ross, regardless of whether the customers were located in her old territory. We find that it was reasonable for the trial court to limit its injunction only to the customers located in Ross' old territory because there is no evidence in the record that Ross had contact with customers outside her territory, or even had access to plaintiff's full customer list, during her employment with plaintiff. As noted in *McRand, Inc. v. Van Beelen* (1985), 138 Ill. App. 3d 1045, 486 N.E.2d 1306, a case involving similar circumstances: "[t]he employee should only be excluded from the territory where he was able to estab-

lish a certain relationship with the former employer's customers." 138 Ill. App. 3d at 1058, 486 N.E.2d at 1315.

Plaintiff also argues that the trial court's injunction should have been extended to more than the designated six customers because Ross used confidential information acquired during her employment with plaintiff for her own and Tech Data's benefit. It argues that though there is no direct evidence that Ross misappropriated plaintiff's customer list or misused any other confidential information she received while working for plaintiff, circumstantial evidence, particularly the increased number of credit inquiries from Tech Data as well as the fact that substantial numbers of customers of plaintiff began doing business with Tech Data after Ross began working for the company, demonstrates the misuse of the customer list and other confidential information.

■ Plaintiff concedes that there is no direct evidence that Ross misappropriated plaintiff's customer list or misused any confidential information and there is no evidence linking the increased credit inquiries or increase in customers shared by plaintiff and Tech Data to Ross' activity. The increase may have occurred simply because of the natural business development of Tech Data in the area and the consequent expansion of the number of customers which both Tech Data and plaintiff served. Moreover, the fact that so many of plaintiff's customers contacted by Ross were also customers of Tech Data is a significant factor in finding that there has been no improper use of confidential information. (See, *e.g., Reinhardt Printing Co. v. Feld* (1986), 142 Ill. App. 3d 9, 490 N.E.2d 1302.) Consequently, we cannot conclude that the trial court's finding that there was no misuse of confidential information is contrary to the manifest weight of the evidence.

Plaintiff next contends that the trial court erred in not awarding punitive damages against Tech Data for Tech Data's tortious interference with its contractual relationship with Ross. It argues that punitive damages should have been awarded because Tech Data encouraged as well as allowed Ross to continue to contact plaintiff's customers. We disagree.

■ An award of punitive damages is appropriate where a defendant's actions are accompanied by aggravated circumstances such as wantonness, willfulness, malice, fraud, oppression, violence and recklessness. (*Zokoych v. Spalding* (1976), 36 Ill. App. 3d 654, 344 N.E.2d 805.) A request for punitive damages is a matter addressed to the sound discretion of the trial court, and a decision to deny such damages will not be reversed absent an abuse of that discretion. *8930*

*South Harlem, Ltd. v. Moore* (1978), 61 Ill. App. 3d 293, 377 N.E.2d 1049.

■ Under the circumstances of the present case, we cannot say that the trial court's denial of punitive damages constitutes an abuse of discretion. The evidence does not show aggravated circumstances. Moreover, there is evidence to the contrary that Tech Data, through its agent, Mark Bennett, gave Ross certain guidelines to avoid conflict with the terms of her employment agreement with plaintiff. These guidelines would appear to be reasonably directed to avoiding such a conflict. At best, under the evidence presented, Tech Data can be charged only with a failure to carefully monitor Ross' compliance with the guidelines. Tech Data's failure to carefully monitor its own guidelines does not rise to the level of aggravated circumstances which have in other instances warranted an award of punitive damages. See, *e.g.*, *Zokoych v. Spalding* (1976), 36 Ill. App. 3d 654, 344 N.E.2d 805.

Plaintiff cites to *Smith-Shrader Co. v. Smith* (1985), 136 Ill. App. 3d 571, 483 N.E.2d 283, a case involving a claim of tortious interference with business relations, as support for its argument that Tech Data's conduct warrants an award of punitive damages. *Smith-Shrader*, however, involved the aggravated circumstances of a defendant, a 50% owner and officer of the plaintiff corporation, upon his decision to resign from plaintiff but before his actual resignation, directly approaching and soliciting the business of plaintiff's two largest customers. Under these circumstances, the court found his action to be intentional and without just cause and, as such, a basis for an award of punitive damages. Tech Data's failure to carefully monitor its own guidelines does not warrant a similar conclusion.

On cross-appeal, defendants contend that the trial court erred in granting relief as to any of the six customers because, in the case of all six, the "near permanent" test was not met and, additionally, in the case of PC Point, the "but for" test was not met. Having affirmed the trial court's grant of the injunction in connection with the six customers, we have effectively disposed of this contention.

Defendants also contend that the court erred in "construing" the term "line of products," in the restrictive covenant in Ross' employment contract with plaintiff, to denote a generic type of product, such as a printer or modem, rather than a specific product of a specific manufacturer, such as the printer or modem sold by Toshiba or Samsung. They argue that had the court interpreted the term to mean the products of a specific manufacturer, the damages awarded plaintiff would have been sharply reduced because much of the products sold by

Ross to the six customers was of a manufacturer only carried by Tech Data.

We find sufficient evidence in the record to support the construction given by the trial court to the term "line of products." The evidence shows that to have been the interpretation given to the term by the parties to the employment contract. Both Robert Curley, plaintiff's chairman of the board, and Steven Rosenthal, its sales manager, testified that the term referred to the general categories of product sold by plaintiff. Additionally and most significantly, Ross conceded that meaning in the resume which she prepared and submitted to Tech Data as part of her employment application when she referred to the product lines she handled for plaintiff by generic type and not by specific manufacturer's names.

When a term in an agreement is doubtful or uncertain, the meaning given to the term by the parties will be adopted. (See *Wald v. Chicago Shippers Association* (1988), 175 Ill. App. 3d 607, 529 N.E.2d 1138.) Though Ross did later testify at trial that she "always" believed the term denoted the products of a specific manufacturer, it was for the trier of fact to resolve this contradiction with the concession contained in her earlier prepared resume. Moreover, we find merit in plaintiff's contention that the noncompetition agreement would make little sense if its protections applied only to the sale of given products of specific manufacturers rather than to generic product types. It is common knowledge that competition is largely over general product types rather than manufacturers' names. This was asserted by the plaintiff in its brief and remains unchallenged by the defendants.

For the foregoing reasons, we affirm the judgment of the trial court.

Affirmed.

LORENZ, P.J., and COCCIA, J., concur.