THE LABEL PRINTERS, Plaintiff-Appellee, v. JOHN C. PFLUG, Defendant-Appellant.

Second District   No. 2—90—0700

Opinion filed January 15, 1991.—Rehearing denied January 24, 1991.

484

Steven N. Peskind, of Peskind & Peskind, Ltd., of Aurora, and Griffith & Jacobson, of Chicago (James E. Mahoney, of counsel), for appellant.

Drendel, Schanlaber, Horwitz & Tatnall, of Aurora (David J. Chroust, of counsel), for appellee.

PRESIDING JUSTICE UNVERZAGT delivered the opinion of the court:

Plaintiff, The Label Printers, sought a preliminary injunction in the circuit court of Kane County against defendant, John Pflug, seeking to prohibit him from violating the terms of a noncompetition and nondisclosure agreement which defendant signed when he began working as a salesman for plaintiff. Following a hearing, the trial court granted the preliminary injunction, enjoining defendant from future solicitation of businesses to which he had made sales while employed by defendant, which had been assigned by plaintiff during his tenure with the company or which were prior clients of plaintiff.

On appeal, defendant argues that the noncompetition and nondisclosure agreement is unenforceable. We agree and reverse the judgment entered below.

The evidence as adduced at the preliminary injunction hearing was as follows. On February 24, 1987, plaintiff, a manufacturer and seller of customized pressure sensitive labels, hired defendant as a salesman. On his first day of work, defendant was taken through the plaintiff's manufacturing plant and shown the different manufacturing machines. Also, plaintiff was shown how to prepare the paper work involved in orders. On the second day, defendant accompanied an experienced sales representative on her calls. On the third day, defendant began making calls of his own.

The testimony showed that defendant was able to walk through the manufacturing plant at any time. Defendant knew the basics regarding how certain labels were manufactured and the materials used in making them. On one occasion defendant came into the plant on a Saturday to learn a particular printing process, flexography.

In the beginning of his employ with plaintiff, defendant was assigned a particular area of concentration bounded on the east by Lake Michigan, on the west by route 294, on the south by the Kennedy Expressway, and on the north by the Illinois/Wisconsin border. Both defendant and William Kane, partner, vice-president, and general manager of plaintiff, stated that, even though defendant was assigned a particular area, his territory was unlimited. Defendant said that he was able to go anywhere in the State as long as no other sales repre-

sentative had "a card" on a prospective business, *i.e.*, had previously called on the customer. According to defendant, there was no way to know if another salesman had called on a business until he received his end-of-the-month report reflecting the calls he had made. That report would show which customers had been previously called on by someone else.

When defendant first started working for plaintiff, plaintiff gave him certain existing accounts. Later, when defendant's sales were faltering, plaintiff gave him some more accounts, specifically outside of defendant's original assigned area of concentration as well as out of State.

Defendant was to call on existing customers assigned to him and to make "cold calls" to pick up new business. When making calls, defendant tried to get a sample of the label which a prospective customer wanted to order. Defendant would then measure it, describe it, and turn in a quote for the prospective order to plaintiff. In a day or two, plaintiff would return defendant's quote to him with a price to be quoted to the customer. Defendant would then contact the prospective customer with the price. Sometimes a prospective customer would tell defendant the price offered by a competitor and who the competitor was.

During his employ with plaintiff, defendant's total sales equalled $26,000 for 1987, $69,000 for 1988, and $117,000 for 1989. The total annual sales of the plaintiff was between $6 million and $7 million. Due to his low sales, defendant learned that plaintiff was going to let him go. Defendant resigned March 23, 1990, and went to work three days later for National Data Label (NDL), a company which also manufactures pressure sensitive labels and which solicits and sells labels in the area in which defendant sold labels on behalf of plaintiff. With NDL, defendant's sales territory rotates. Of the five territories in the rotation scheme, only one of the territories actually encompassed any of the territory which was defendant's original assigned area of concentration when he worked for plaintiff.

Following his departure from plaintiff, defendant contacted 40 to 50 potential customers in his former area of concentration. Of the 57 accounts defendant maintained he had when he left plaintiff, defendant admitted having contacted 85% of them on behalf of NDL. Of these accounts, some were already customers of NDL prior to defendant's accepting employment with NDL. Of those who became customers of NDL since defendant's employment, the majority were customers defendant had secured on his own while working for plaintiff. Additionally, defendant related that the items purchased by these

businesses from NDL were items that the customers had not previously purchased from plaintiff when he was working for plaintiff.

Defendant stated that during his two months with NDL, he had made approximately 700 personal calls on businesses. Of these, about 45 businesses were customers that he had done business with while employed by plaintiff. Defendant maintained that only 19 of the 57 accounts he had at the time he left plaintiff were "house accounts" given to him by plaintiff and that the rest of the accounts were obtained by him through "cold" calls. Plaintiff maintained that at the time of his resignation defendant had 76 accounts of which 35 were house accounts. Of these 76 accounts, plaintiff was the exclusive supplier for only two or three of them. The other customers purchased labels from other suppliers besides plaintiff.

At the time defendant began working for plaintiff, he had signed a noncompetition and nondisclosure agreement. That agreement prohibited defendant from soliciting or selling pressure sensitive labels to any former customers of plaintiff for a period of 18 months after defendant left plaintiff's employment. Specifically, the agreement provided:

> "During his employment with the Partnership and any successor entity thereto, and for a period of eighteen (18) months after the termination of such employment, he will not for himself or for any other person, firm, corporation, partnership, association or other entity, sell or offer for sale, canvass, solicit or deliver, any products which are then sold by the Partnership to any person, firm, corporation, partnership, association or other entity, who is, or has been within the period ending on the date of such termination, a customer of the Partnership."

Additionally, the agreement prohibited defendant from engaging in any business competition with plaintiff within the geographic area in which he had represented plaintiff. Paragraph 2 of the agreement provided:

> "During his employment with the Partnership, and any successor entity thereto, and for a period of eighteen (18) months after the termination of such employment, he shall not directly or indirectly, within any geographical area in which he has at any time represented the Partnership (hereinafter referred to as the 'Restricted Territory'), enter into or engage in a business which is in competition with the business of the Partnership, either as an individual for his own account, or as a partner or joint venturer, or as an employee, agent or salesperson for any person, or as an officer, director or a shareholder of

any corporation, or otherwise. Solicitation or acceptance of orders outside the [r]estricted area for shipment to, or delivery in, any of the Restricted Territory shall constitute 'engaging in business' in the Restricted Territory in violation of this Agreement."

On April 12, 1990, plaintiff brought a complaint against defendant for a temporary restraining order, preliminary injunction, and permanent injunction. In its complaint plaintiff asserted that defendant had violated the preceding provisions of the noncompetition and nondisclosure agreement. Plaintiff alleged that since defendant's resignation from the company, he had solicited the purchase of NDL's pressure sensitive labels from businesses which were defendant's customers at the time of his resignation.

Additionally, plaintiff alleged that defendant had also violated paragraph 3 of the agreement by using confidential information obtained during his employment with plaintiff. Paragraph 3 provided:

"Both during and after his employment with the Partnership, he will not use his knowledge of the business or customers of the Partnership for the benefit of himself or any other person, firm, corporation, partnership, association or other entity, or divulge or disclose to any person or entity information or data concerning the business affairs of the Partnership, including the names of customers, names of employees, number or character of contracts, prices, terms or particulars of the trade or business of the Partnership; and he agrees that he will, in all things and in good faith, protect the good will of the business of the Partnership, and keep confidential his knowledge of such business affairs acquired while in the employ of the Partnership."

At the hearing on plaintiff's complaint, William Kane, plaintiff's vice-president and general manager, testified that 90% to 95% of plaintiff's business consisted of the manufacture of custom labels of an uncommon nature. Kane stated that customers would bring blueprints to plaintiff and explain the particular construction or application they had in mind for a label. Plaintiff would then design a label that would suit the customer's needs. Frequently, Kane admitted, a customer's blueprints were given to several manufacturers at one time. Sometimes a blueprint would tell what materials a competitor had used to make the label.

Kane stated that it was commonplace for a salesperson to bring in a particular blueprint and to discuss with plaintiff the application and materials plaintiff would use to produce the label needed. This type of

discussion occurred so that the next time a salesperson had a similar request, he would know what to suggest to a customer without having to discuss it with plaintiff.

According to Kane, plaintiff had a tremendous amount of "repeat" business. Many of the existing accounts given to defendant had been customers with plaintiff for periods in excess of six years and as long as 20 years. Kane admitted that of the accounts defendant had when he left plaintiff's employ, only two or three dealt exclusively with plaintiff. All others dealt with other label suppliers as well.

Kane estimated that probably 50 companies in Illinois manufacture pressure sensitive labels. When asked how many Illinois businesses purchase pressure sensitive labels, Kane replied, "virtually everyone."

Kane testified that plaintiff's manufacturing plant is "closed" to outsiders because of certain custom processes which plaintiff has invented and because of certain adaptations it has made to its machinery. Nevertheless, outsiders could gain access to the plant by receiving permission from one of the officers of the company. Employees had full access to plaintiff's manufacturing plant, and defendant did come in to the plant during his employment.

While working for plaintiff, defendant, as well as all other employees, received a notice requesting him not to share with any outside party any information regarding how certain confidential procedures and manufacturing processes work. Defendant signed and dated the notice, indicating his compliance with plaintiff's request. Kane stated that only one of its processes was patented and admitted that a patent application, which fully discloses a patent process, is a matter of public record.

When defendant left plaintiff's employ, he retained the salesman's copies of his customers' purchase orders. These copies contained, among other items, the names and addresses of customers and the amount and description of the product ordered as well as the date ordered and the price. Defendant admitted keeping the copies when he resigned but maintained that he had used the information on the copies only once to determine the inventory and needs of a former customer and to submit a competitive bid for NDL, which was accepted. Eventually, defendant turned over his salesman's copies to his attorney upon the request of plaintiff's attorney.

William Iovino, a salesman for NDL, testified that he had been involved in the sale of pressure sensitive labels for 16 years. Iovino stated that he is not the sole supplier of labels for any of his 80 customers and that sometimes a customer will tell him the price that has

been quoted by a competitor for a particular label. Iovino identified 10 customers on the list of accounts defendant had when he left plaintiff as customers which had also done business with NDL before defendant came to work there.

Glen Watson, a salesperson with NDL, worked for plaintiff prior to his employment by NDL. Watson related that sometimes customers tell him the materials competitors are using in the production of a label and the price of the label. In most cases, according to Watson, he knew exactly what materials were being used for the production of a label because he had a blueprint or a sample of the label from the customer or the customer provided him with information he needed about the label. Watson identified seven different companies on defendant's list of former accounts which Watson knew bought labels from several different suppliers simultaneously.

The trial court subsequently entered its order preliminarily enjoining defendant from:

"1. Further solicitation of pressure sensitive label orders from those accounts to whom he had made sales while employed by Label or which were prior existing accounts of Label and which are located within the 'area of concentration' which was originally assigned him by Label and as set forth above, or within the zip code areas subsequentlay [sic] assigned in the Milwaukee area.

2. Further solicitation of pressure sensitive label orders from those accounts which were assigned to him by Label during his tenure with them, whether within or without the initial 'area of concentration' assigned him.

3. Communicating to any person or entity any information obtained by him during his employ by Label as to names and needs of customers of Label during his tenure there, or of manufacturing processes, printing methods, materials used, sources of materials, prices, quantities, samples, operating methods or other information that might assist that person or entity in competing with Label."

Subsequently, defendant brought this interlocutory appeal pursuant to Supreme Court Rule 307(a)(1). 107 Ill. 2d R. 307(a)(1).

■ A preliminary injunction is an extraordinary remedy used only in situations where an extreme emergency exists and serious harm would result in the absence of the injunction. (*Carbonic Fire Extinguishers, Inc. v. Heath* (1989), 190 Ill. App. 3d 948, 951.) The decision to grant or deny injunctive relief rests within the sound discretion of the trial court. (*Southern Illinois Medical Business Associ-*

*ates v. Camillo* (1989), 190 Ill. App. 3d 664, 672.) Because the court's findings may not be disturbed absent an abuse of discretion, the reviewing court's role is limited to determining whether those findings are contrary to the manifest weight of the evidence. *Reinhardt Printing Co. v. Feld* (1986), 142 Ill. App. 3d 9, 15.

■ The propriety of injunctive relief in the instant case depends upon the enforceability of the restrictive covenants contained in the noncompetition and nondisclosure agreement signed by defendant at the time he was hired by plaintiff, and that determination is a question of law. (*Reinhardt*, 142 Ill. App. 3d at 15.) Covenants not to compete are, in effect, restraints on trade and will be carefully scrutinized to ensure that their intended effect is not to prevent competition *per se.* (*Capsonic Group v. Swick* (1989), 181 Ill. App. 3d 988, 992.) A restrictive covenant may be held enforceable only if the time and territorial limitations are reasonable and the restrictions are reasonably necessary to protect a legitimate business interest of the employer, a determination which necessarily turns on the facts and circumstances of each case. *Southern Illinois*, 190 Ill. App. 3d at 672; *Reinhardt*, 142 Ill. App. 3d at 15.

■ There are two general situations in which an employer's legitimate business interests may be found for purposes of enforcing a covenant not to compete: (1) where, by the nature of the business, plaintiff has a near-permanent relationship with its customers and but for his employment, defendant would not have had contact with them; or (2) where the former employee learned trade secrets or acquired other confidential information through his employment with plaintiff and subsequently attempted to use it for his own benefit. (*Shapiro v. Regent Printing Co.* (1989), 192 Ill. App. 3d 1005, 1010-11; *Reinhardt*, 142 Ill. App. 3d at 16.) Plaintiff, in this court, as in the court below, contends that both situations exist in this case. Defendant maintains that neither situation exists.

■ Factors to be considered in determining whether a near-permanent relationship exists between an employer and its customers for the purpose of enforcing noncompetition covenants include the time, cost, and difficulty involved in developing and maintaining the clientele, the parties' intention to remain affiliated for an indefinite period, and the continuity as well as the duration of the relationship. (*Reinhardt*, 142 Ill. App. 3d at 16.) In the instant case, no evidence was presented to show how long it took to develop plaintiff's clientele. However, the testimony suggested that clients could be obtained after only a few meetings. Nor was there any evidence to indicate that plaintiff made any large pecuniary investment in its customers.

Although William Kane, plaintiff's vice-president and general manager, testified that plaintiff had a tremendous amount of "repeat" business, thereby implying that plaintiff's customers remained affiliated with plaintiff in a continuous relationship, Kane also admitted that most of plaintiff's customers were affiliated with other suppliers besides plaintiff.

The facts in the case at bar are not unlike those in *Reinhardt Printing Co. v. Feld* (1986), 142 Ill. App. 3d 9. In *Reinhardt*, defendant was hired as a salesperson by plaintiff, a small commercial printing company doing business primarily in the downtown Chicago area. When hired, defendant signed an employment agreement containing post-employment nondisclosure and noncompetition covenants. Although defendant was hired only to procure new accounts, some "house accounts" were given to her. Of the 76 accounts on a list prepared by defendant, 25, according to plaintiff, were house accounts. Defendant secured the other accounts by making "cold calls" to businesses located in the "Yellow Pages" and on the directories of downtown office buildings she canvassed.

When defendant voluntarily terminated her employment with plaintiff two years later and accepted employment as a salesperson with another commercial printing company, also located in downtown Chicago, plaintiff filed a complaint for injunctive relief. The lower court issued a preliminary injunction restraining defendant from violating the noncompetition and nondisclosure covenants in the employment agreement.

On appeal, the appellate court found that plaintiff failed to establish a legitimate business interest which needed protecting. Specifically, the court found that the majority of defendant's 76 accounts which she had been enjoined from contacting in her new position were "short-term, impermanent customers whose business she was able to solicit not *because* of her association with plaintiff, but rather, through her own efforts on plaintiff's behalf and in furtherance of her association with it." (Emphasis in original.) (142 Ill. App. 3d at 17.) In so finding, the court pointed out that plaintiff had not alleged in its complaint that the customers it sought to enjoin defendant from soliciting were near-permanent ones. The only evidence in this regard was presented by plaintiff's president, who testified that some of the house accounts had done business with plaintiff for anywhere from 5 to 10 years. Defendant indicated that of the 76 accounts she serviced, all but about 17 of them were obtained by her by making cold calls on businesses.

Other testimony belied plaintiff's claim of a near-permanent busi-

ness interest which needed protection. The owner of another commercial printing company testified that the printing industry is highly competitive and that often customers do business with several printers, sometimes simultaneously. Another witness, a former employee of one of the 25 firms plaintiff identified as one of its house accounts, testified that during the time she was responsible for purchasing her company's printing, salespersons from numerous printing companies frequently called on her and that she ordered from as many as six or seven different printers at a time.

In the case at bar, plaintiff, like the plaintiff in *Reinhardt*, also did not allege in its complaint the near-permanency relationship of the customers it sought to enjoin defendant from soliciting. The only evidence in this regard was presented by William Kane, plaintiff's vice-president and general manager, who guessed that some of the accounts assigned to defendant during his employ with plaintiff had been plaintiff's customers for anywhere from 6 to 20 years. Of these accounts, however, Kane admitted that plaintiff was the exclusive supplier for only two or three of them and that all the remaining customers bought labels from other suppliers as well as from plaintiff.

Plaintiff maintained that at the time of defendant's departure from plaintiff's employment, defendant had 76 accounts, 35 of which were assigned to defendant by plaintiff. We note, however, that in arriving at this figure plaintiff has listed some firms several times, the only differentiation being in the shipping addresses of the firms. On the other hand, defendant's list of accounts, which names each firm only once, sets forth 57 accounts, 19 of which, according to defendant, were assigned to him. Despite the parties' differing figures, the evidence shows that the majority of accounts defendant serviced were ones whose business defendant secured by making cold calls in industrial parks or by using the Illinois Harris Guide, which lists Illinois manufacturers and what they manufacture as well as giving their locations.

Additionally, the testimony of William Iovino, a salesman for plaintiff's new employer, NDL, who had been in the pressure sensitive label business for 16 years, revealed that out of the approximately 80 customers he had, no more than 25 had been customers for more than five years. Iovino also testified that NDL was not the sole supplier of labels for any of the 80 customers. Iovino identified 10 firms on the list of customers serviced by defendant when he was employed with plaintiff which had done business with NDL prior to defendant's change of jobs.

Glen Watson, a salesman for NDL and a former salesman of plain-

tiff, testified as to the competitive nature of the label business. Watson stated that as a result of a price structuring study he performed for NDL, he discovered that there are 275 label-related companies in the Illinois, Indiana, and Wisconsin area. Additionally, Watson identified companies on defendant's list of accounts which Watson knew had other suppliers of labels in addition to plaintiff.

Given all the evidence presented, we conclude, as did the court in *Reinhardt*, that plaintiff failed to establish the near-permanency of its relationship with its customers and that most of the customers which plaintiff was attempting to enjoin defendant from contacting were customers defendant secured through his own efforts on plaintiff's behalf and not because of his association with plaintiff.

Having so concluded, we must next consider, as did the *Reinhardt* court, whether the evidence here established the second type of situation in which a protectable business interest is recognized, *i.e.*, "the acquisition and subsequent attempted misuse by defendant of trade secrets or other confidential information." *Reinhard*, 142 Ill. App. 3d at 17.

A trade secret is a plan or process, tool, mechanism, compound or informational data utilized by a person in his business operations and known only to him and such other limited persons to whom it may be necessary to confide it. (*Capsonic Group v. Swick* (1989), 181 Ill. App. 3d 988, 993.) Factors to consider in determining the existence of a trade secret include the extent to which the information is known outside of the business, as well as to employees and others involved in the business; the extent of measures taken to guard the secrecy of the information; the value of it to the employer and to his competitors; the amount of effort and/or money expended in developing the information; and the ease or difficulty with which it could be acquired or duplicated by others. (*Reinhardt*, 142 Ill. App. 3d at 17-18.) Information is not regarded a trade secret if it is generally known within an industry, or fully disclosed by the company through its own catalogs or literature, disseminated throughout the industry, or by the products themselves. 142 Ill. App. 3d at 17.

In certain circumstances a customer list can constitute a trade secret (*Cincinnati Tool Steel Co. v. Breed* (1985), 136 Ill. App. 3d 267, 277), but only where the customer lists or other customer information have been developed by the employer over a number of years at great expense and kept under tight security. (*Lincoln Towers Insurance Agency v. Farrell* (1981), 99 Ill. App. 3d 353, 358.) The same type of information, however, is not a trade secret where it has not been treated by the employer as confidential and secret, was gen-

erally available to other employees and known by those in the trade, could be easily duplicated by reference to telephone directories or industry publications, and where customers did business with more than one company or otherwise changed businesses frequently so that they were known to the employer's competitors. 99 Ill. App. 3d at 358.

■ Plaintiff's complaint alleged that during his term of employment with plaintiff, defendant had "obtained certain confidential information, including but not limited to manufacturing processes, customer names and requirements, and pricing information."

Plaintiff maintained through testimony by William Kane that it kept a "closed shop," *i.e.*, no outsiders other than employees were allowed into the manufacturing area, implying thereby that its manufacturing processes were secret. Kane explained that the plant was closed to outsiders because a lot of plaintiff's custom processes were invented by plaintiff and because plaintiff had made certain adaptations to the machinery it used. Kane testified, however, that only one of plaintiff's label manufacturing processes was patented, and Kane admitted that patented processes are matters of public record. Kane also indicated that outsiders did have access to plaintiff's plant once they received the permission of one of the officers. Moreover, Kane stated that plaintiff did not require its customers to keep confidential the information plaintiff provided to them. Thus, customers could reveal to others the processes or materials involved in producing their relative labels.

Kane admitted that the blueprints customers often provided to plaintiff for use in the design and production of a custom label were frequently submitted to several manufacturers simultaneously. Additionally, in many cases a blueprint or a label could be used to determine what materials a competitor used to produce the label. It was apparent from the testimony presented, therefore, that any information regarding the manufacture and design of its custom labels which plaintiff claimed was confidential was information which could be acquired or duplicated with relative ease.

Moreover, in a brochure which plaintiff developed for dissemination to customers and prospective customers, plaintiff presented pictures of machinery it used for different manufacturing processes, as well as descriptions of different tasks its machines could perform. Although William Kane indicated the brochure was produced nearly eight years ago, no evidence was presented to show that plaintiff's machinery and processes had changed since that time so as to make the information on the brochure meaningless.

Plaintiff presented no evidence that its customers were acquired

over a number of years at great expense and kept under tight security. William Kane admitted that plaintiff had no master list of its customers and that the only master file it had of its customers was comprised of the office copies of the customers' orders. According to defendant, he did not know the identity of all of plaintiff's customers, a point which plaintiff must concede as true since plaintiff testified that no customer list existed. Because no list of customers existed, defendant occasionally made calls on existing customers without realizing that fact until the end of the month when he received his "call" report. On that report plaintiff would indicate which businesses defendant called upon were already customers of plaintiff.

Moreover, the list of accounts prepared by defendant could not be considered confidential. The accounts named thereon were generated by defendant through "cold" calls in industrial parks or by reference to the Illinois Harris Guide, a fact demonstrating that the list could be readily duplicated by anyone in the field. (*Reinhardt*, 142 Ill. App. 3d at 19.) Of those accounts, many were known to plaintiff's competitors by virtue of the fact that, with the exception of two or three of plaintiff's customers, the remainder did business with other label suppliers besides plaintiff.

Plaintiff's claim that defendant possessed confidential pricing information appears to be based on the fact that defendant did not return his copies of customer's sales orders at the time he was in plaintiff's employ. Defendant testified that, prior to returning the copies upon request of plaintiff's attorney, he had used the information on these copies only once to approach a former customer and to obtain an order. That information included a customer's name, the date of its order, a description of the product ordered, the quantity ordered, and the price. Defendant stated that he made no records of the information on the orders, and plaintiff did not controvert this testimony.

Defendant testified that when working for plaintiff he had no discretion in determining the prices of items ordered and that he had no knowledge of the underlying costs involved in the manufacture of any particular label or of the markups or profit margins. The only information regarding pricing which defendant possessed were the prices plaintiff directed defendant to quote to customers. This was information which could be readily ascertained by any competitor since the evidence showed that many customers would willingly tell a salesperson the prices being quoted by a competitor. Plaintiff failed to demonstrate that the figures supplied to defendant for use in quoting the final cost of an order were confidential or substantially different from those of its competitors. *Reinhardt*, 142 Ill. App. 3d at 20.

We conclude that defendant, during his employment with plaintiff, had not acquired any trade secret or confidential information which was not already known to plaintiff's competitors or which could not be easily ascertained by them.

From our review of the record, we find, therefore, that plaintiff failed to establish the existence of a legitimate business interest which needed protecting and that, therefore, the issuance of a preliminary injunction was against the manifest weight of the evidence. Having so found, we find it unnecessary to address the defendant's contention that the noncompetition covenant was excessively broad in its geographic scope. *Reinhardt*, 142 Ill. App. 3d at 20.

The order of the circuit court of Kane County granting plaintiff's motion for preliminary injunction is reversed.

Reversed.

DUNN and WOODWARD, JJ., concur.