**R.R. DONNELLEY & SONS COMPANY, Plaintiff,**

v.

**James E. FAGAN, Jr., Bowne of New York City, Inc. and Bowne & Company, Inc., Defendants.**

No. 91 Civ. 0671 (RPP).

United States District Court, S.D. New York.

June 27, 1991.

Sidley & Austin by Robert A. Downing, New York City, for plaintiff.

Mendes & Mount by Leo W. Fraser, III, New York City, for defendant James E. Fagan, Jr.

Simpson Thacher & Bartlett by Melvyn L. Cantor, New York City, for defendants Bowne of New York and Bowne & Co.

## OPINION AND ORDER

ROBERT P. PATTERSON, Jr., District Judge.

Plaintiff R.R. Donnelley & Sons Company ("Donnelley") seeks injunctive relief pursuant to Rule 65 of the Federal Rules of Civil Procedure, enjoining defendant James E. Fagan, Jr. ("Fagan"), a former employee of Donnelley, "from working, nationwide, for any competitor of Donnelley's in the financial and legal printing business," for the period of six months from the issuance of this Opinion and Order, Plaintiff's Post–Hearing Memorandum at 16, n. 7, and from revealing confidential Donnelley information. In particular, Donnelley seeks to enjoin Fagan from working during such period for defendants Bowne of New York City, Inc. and Bowne & Company, Inc. (collectively "Bowne") and from soliciting or assisting in the solicitation of 29 specific purchasers of printing services and from revealing any confidential information of Donnelley as Donnelley defines it.

The underlying action is Donnelley's complaint against Fagan and Bowne alleging breach of contract, breach of fiduciary duty, tortious interference with contract and unfair competition. At issue is the enforceability of a non-compete agreement and a confidentiality agreement signed by Fagan while an employee of Donnelley, and whether Donnelley is entitled to the equitable relief it seeks. Donnelley submitted an order to show cause why a preliminary injunction should not be issued and requested a temporary restraining order pending a hearing and the Court's deci-

sion on the preliminary injunction. The Court declined to issue a temporary restraining order. Pursuant to Rule 65(a)(2) of the Federal Rules of Civil Procedure, the Court consolidated the evidentiary hearing on the preliminary injunction with a prompt hearing on the permanent injunction. That hearing was held shortly thereafter, from February 19–22, 1991.[1] At the close of the hearing, defendants jointly moved, without presenting any evidence, for a directed verdict on all claims against them, on the ground that Donnelley's entire case is insufficient as a matter of law and fails to make a *prima facie* showing that it is entitled to any of the relief requested.

For the reasons stated below, the Court finds that the non-compete agreement at issue is unenforceable and that Donnelley has failed to show Fagan possesses confidential information as to which Donnelley is entitled to the injunctive protection requested. Accordingly, the injunctive relief is denied. The defendants' motion for a directed verdict on all claims is granted.

## BACKGROUND

Donnelley is a printing services company, with headquarters in Chicago, Illinois, offices around the country and a nationwide clientele. Bowne is also a printing services company with nationwide offices and clientele. Bowne competes with Donnelley in the financial and legal printing business and both companies earn substantial revenues from the specific area of printing legal and financial documents. Richard Thursby, Senior Vice–President of Donnelley's financial and legal services group ("Thursby"), testified that, in the financial and legal area of the printing industry, "[f]or all practical purposes, we have two national competitors, and principal among them is Bowne." Tr. 29.[2]

Fagan was employed by Donnelley from 1984 to 1987 as a Sales Representative and from 1987 to 1988, as a Customer Service Manager. In March of 1988, he was pro-

---

**1.** References to the transcript of the hearing will appear as "Tr. ___." Exhibits submitted as evidence at the hearing will be referred to, e.g., as Exhibit 1, etc.

**2.** The other competitor Thursby named was K.F. Merrill. *Id.* at 30.

moted to the job of Vice–President and Regional Sales Manager. As a condition of his promotion to Vice–President and Sales Manager, Fagan signed a non-compete agreement (the "Non–Compete Agreement"). Exhibit 3. On November 28, 1988, he also signed an agreement containing restrictive covenants as to confidentiality and non-solicitation of employees (the "Confidentiality Agreement"). Exhibit 2.

The Non–Compete Agreement contains restrictive covenants regarding employment and solicitation of customers. Upon Fagan's objections in 1988 to the Non–Compete Agreement in its original form, Donnelley and Fagan negotiated a clause which provides that, if Donnelley chose to enforce the Non–Compete Agreement, it would pay Fagan his base salary for up to twelve months following the end of his employment with Donnelley, which would be $9000 per month, minus the appropriate deductions.[3] After it was amended, Fagan signed the Non–Compete Agreement.

Primarily at issue are paragraphs 1–4 of the Non–Compete Agreement, which read as follows:

1. If you choose to leave Donnelley or if your employment with Donnelley is terminated for any reason, you will not for a period of one (1) year following your termination, directly or indirectly, either as an employee, employer, consultant, agent, principal, partner, stockholder, corporate officer, director or in any other individual or representative capacity, nation-wide, engage in any business which is competitive with the Financial and Legal printing business of Donnelley; and

2. In addition, for a period of one (1) year following the termination of your employment with Donnelley for any reason, you will not directly or indirectly, either as an employee, employer, consultant, agent, principal, partner, stockholder, corporate officer, director or in any other individual or representative capacity, solicit, assist in the solicitation of, accept any business from, or do any work relating to any customer or customers who, during the two (2) years immediately preceding your termination, had been assigned to you by Donnelley or any customer or customers which you had contacted on behalf of Donnelley while an employee of Donnelley or relating to which you or any of those employees who directly or indirectly reported to you did any work; or disclose to any person, firm, association, corporation or business entity of any kind the names or addresses of any such customer or customers; or directly or indirectly in any way request, suggest or advise any such customer or customers to withdraw or cancel any of their business or refuse to continue to do business with Donnelley. This paragraph shall apply only where the customer is solicited to purchase a service or product that competes with the or [sic] the Financial and Legal printing service or products offered by Donnelley.

3. Donnelley in its sole discretion may, in writing, release you from the obligations under Paragraph 1 and/or 2 above. If Donnelley does not, within 30 days from receiving a request for such release in writing from you, release you from the obligations under Paragraph 1 and/or 2 above, then Donnelley shall pay you your base salary only per month (less appropriate deductions), excluding any incentive compensation, bonuses, options, stock purchase plan participation, stock awards, or payments under any similar plan, for each month Donnelley does not so release you, up to a maximum of twelve (12) months following your termination. This amount shall be payable only if all outstanding charges, reimbursed business expenses, advances, spoilages or other related matters are fully accounted for and resolved to Donnelley's satisfaction, and all Donnelley documents have been returned to Donnelley by you.

4. The special and unique nature of the customer relationship and Donnelley's interest therein, as recognized above, shall

---

**3.** The original document provided for payment of $1000 per month, regardless of actual base salary.

permit Donnelley to enforce the protection afforded under this agreement by injunctive relief in addition to, and not as a substitute for any and all other remedies available to it under the law.

Exhibit 3, ¶¶ 1–4.

The Non–Compete Agreement also provides that if any part of it is held to be invalid, a court construing it may modify the Agreement to make it enforceable. *Id.*, ¶ 8–9.

Also at issue is the Confidentiality Agreement which, among other things, offers a sweeping definition of what Donnelley considers to be "confidential information" and Fagan's obligations not to disclose it. It also provides in part that:

> Confidential Information includes, but is not limited to, "Trade Secrets" to the full extent of the definition of that term under Illinois law. It does not include "general skills, knowledge and experience" as those terms are defined under Illinois law.

Exhibit 2, ¶ 2. Examples of "Confidential Information" are included in paragraph 3 of the Confidentiality Agreement as follows:

> [C]omputer programs, unpatented inventions, discoveries or improvements; marketing, manufacturing, organizational research and development, and business plans; company policies; sales forecasts; personnel information (including the identity of Donnelley employees, their responsibilities, competence and abilities, and compensation); medical information about employees; pricing and nonpublic financial information; current and prospective customer lists and information on customers or their employees; information concerning planned or pending acquisitions or divestitures; and information concerning purchases of major equipment or property.

Exhibit 2, ¶ 3. Paragraph 5 of the Confidentiality Agreement provides:

> 5. **Confidentiality Obligations.** During and after my employment with Donnelley, I will not (a) disclose, directly or indirectly, any Confidential Information to anyone outside of Donnelley or to any employees of Donnelley not authorized to receive such information or (b) use any Confidential Information other than as may be necessary to perform my duties at Donnelley. In no event will I disclose any Confidential Information to, or use any Confidential Information for the benefit of, any current or future competitor, supplier or customer of Donnelley, whether myself, any subsequent employer, or any other person or entity.

Exhibit 2, ¶ 5.[4]

Fagan became dissatisfied with his employment at Donnelley and, in July of 1990, called George Johnson, who had been his former Sales Manager at Donnelley and who in 1990 was the Vice President and Director of Sales of Bowne of New York City, and asked about employment opportunities at Bowne. Tr. 174–75. They had lunch and discussed the possibility of Fagan joining Bowne; Johnson also introduced Fagan to the president of Bowne International, Carl Crosetto. Tr. 177–78. In late July or early August, 1990, the three men met again for a golf game, during which they again discussed the possibility of Bowne employing Fagan and what his compensation might be. Tr. 179. The same topics were discussed at a dinner meeting between Fagan and Robert Baker, president of Bowne of New York City. Tr. 181.

In late September or early October, 1990, Fagan, Johnson and Crosetto played golf with Richard Koontz, Chief Executive Officer of Bowne & Co., Inc. Tr. 180, 183. Koontz told Fagan he might be employed by Bowne and asked him to meet with

---

**4.** The Confidentiality Agreement also provides: 8. **Former Employers.** I acknowledge that Donnelley expects me to respect and safeguard the trade secrets and confidential information of my former employers. I will not disclose to Donnelley, use in Donnelley's business, or cause Donnelley to use, any information or material that is confidential to any former employer, unless such information is no longer confidential or Donnelley or I have obtained the written consent of such former employer to do so.
Exhibit 2, ¶ 8.

Bowne's attorneys. On October 14 or 15, Fagan met with Thursby in Portland, Oregon, and told Thursby that he was considering options other than employment at Donnelley. Tr. 174–75. Fagan met a few more times with Bowne officials or their attorneys, in October and November of 1990. Tr. 183–86. On November 2, 1990, at a breakfast meeting with Koontz and Johnson, Fagan was advised he would be offered a management position in sales in Bowne's financial and legal printing division, and that an offer would be prepared for his review and acceptance. Fagan spoke by telephone with Koontz once or twice more between November 2 and November 15, 1990. Tr. 187–88.

Before Bowne made Fagan a formal written offer of employment, Fagan and several other senior marketing managers of Donnelley attended a planning meeting which was held at Hartford, Connecticut, on November 15–16, 1990 (the "Hartford meeting"). Tr. 40–45, 169–73. On November 16, 1990, Bowne made a formal offer to Fagan, although Fagan did not actually receive it on that date. Tr. 188–89. Fagan and his attorneys made several changes in the proposal which were accepted by Bowne and resulted in Bowne making Fagan a revised offer on or about December 6, 1990. Tr. 190–91. Fagan accepted the position of Vice–President and Sales Manager with Bowne of New York City, a subsidiary of Bowne & Co., and signed the offer on December 17, 1990. Exhibit 6.

Fagan also resigned from Donnelley on December 17, 1990, effective December 31, 1990. After an exchange of correspondence, Donnelley advised Fagan by letter of January 4, 1991, that it intended to enforce the employment agreements signed by Fagan, including the non-compete provisions, and commenced this action. Both agreements contain provisions that they are to be construed according to Illinois law.

## DISCUSSION

I. Enforceability of Non–Compete Agreement Under Illinois Law

██ Whether a court will enforce a non-compete clause is separate from the question of whether the employee breached his contract. A non-compete clause may be unenforceable as a matter of law. Under Illinois law, for an employer to enforce a non-compete agreement, the employer has the burden of showing that the agreement's intended effect is not to prevent competition *per se*, since such agreements are deemed to be restraints on trade. *Capsonic Group v. Swick*, 181 Ill.App.3d 988, 992, 130 Ill.Dec. 909, 913, 537 N.E.2d 1378, 1382 (Ill.App.Ct.2d Dist.1989). A court will only uphold a non-compete agreement if the scope of the restrictions is reasonable and the restrictions are "reasonably necessary to protect a legitimate business interest of the employer." *Southern Illinois Medical Business Associates v. Camillo*, 190 Ill.App.3d 664, 672, 138 Ill.Dec. 4, 12, 546 N.E.2d 1059, 1065 (Ill App.Ct. 5th Dist. 1989).

> "[E]nforceability of a restrictive covenant in an employment contract is dependent on whether, given the particular facts of the case, the restraints imposed thereby are reasonably necessary for the protection of plaintiff's business from unfair or improper competition.... The reasonableness of the restrictions is measured by their effect, if any, on the general public, the extent of the hardship imposed thereby on the restricted party and whether they are necessary to protect a legitimate business interest of the former employer."

*Instrumentalist Co. v. Band, Inc.*, 134 Ill. App.3d 884, 895, 89 Ill.Dec. 530, 538, 480 N.E.2d 1273, 1281 (Ill.App.Ct. 1st Dist. 1985).

██ If an employment agreement is ancillary to the sale of a business, Illinois courts will enforce non-compete provisions therein if necessary to protect the purchaser/employer against unfair competition. *Lawter International, Inc. v. Carroll*, 116 Ill.App.3d 717, 728–29, 72 Ill.Dec. 15, 23, 451 N.E.2d 1338, 1346 (Ill.App.Ct. 1st Dist. 1983) (appellate court affirmed lower court's award of preliminary injunctive relief against former employee where employment/non-competition agreement at is-

sue was ancillary to sale of business involving technical trade secrets and former employee/owner started competitive company). *See also, O'Sullivan v. Conrad,* 44 Ill.App.3d 752, 3 Ill.Dec. 383, 358 N.E.2d 926 (Ill.App.Ct. 5th Dist.1976) (affirming lower court's grant of injunction; different interests are at issue in employment restraints ancillary to sale of business and employment restraints in simple contract of employment); *Vendo Co. v. Stoner,* 105 Ill.App.2d 261, 245 N.E.2d 263 (Ill.App.Ct. 2d Dist.1969). However, a court will scrutinize a restrictive covenant more closely when it is part of an employment agreement and not ancillary to the sale of a business. *Hamer Holding Group, Inc. v. Elmore,* 202 Ill.App.3d 994, 148 Ill.Dec. 310, 318, 560 N.E.2d 907, 915 (Ill.App.Ct. 1st Dist.1990), *app. den.,* 136 Ill.2d 544, 153 Ill.Dec. 373, 567 N.E.2d 331 (1991) (burden of proof to obtain permanent injunction is higher than for preliminary injunction and business has no protectable interest in clientele absent special circumstances such as restriction ancillary to sale of business).

■ Donnelley asserts that the non-compete agreement should be enforced because it includes a post-employment compensation provision which makes the non-compete clause and other restrictive covenants reasonable. However, the only Illinois case on this point cited to the Court holds that post-employment compensation for complying with a non-compete agreement does not make the restriction on competition more reasonable or enforceable. *G & W Electric Co. v. Joslyn Manufacturing and Supply Co.,* 127 Ill.App.3d 44, 47–48, 82 Ill.Dec. 187, 190, 468 N.E.2d 449, 452 (Ill.App.Ct. 1st Dist.1984) (restriction on employment unenforceable despite provision that former employer would pay employee's full base salary for two years). Rather, enforceability is determined by how relevant and necessary the agreement is to the protection of a former employer's legitimate interests and, if the former employer does not have a legitimate protectable interest or the scope of the agreement is unreasonable, a compensation provision is irrelevant. *Id.*

Apart from restrictive covenants ancillary to a sale of a business, there are two generally separate lines of Illinois cases in which restrictive covenants of an employer may be enforced. The first involves trade secrets or confidential information which the ex-employee subsequently attempts to use for his or her own benefit. The second applies where the former employer has "near-permanent" relationships with customers and the ex-employee has had access to those customers, due solely to his or her position with the former employer.

A.  Possession of Confidential Information or Trade Secrets

■ Donnelley argues that both lines of case law apply to the present action, asserting that the strategic and pricing information to which Fagan had access as a senior executive is confidential information comparable to a trade secret under the cases which have found non-compete agreements enforceable. At the hearing, Donnelley presented testimony as to the confidential nature of the pricing, sales ad marketing information provided to Fagan and particularly about a new marketing strategy discussed at the meeting of senior marketing executives which took place on November 15–16, 1990, in Hartford, Connecticut, and which Fagan attended. Tr. 38–40, 43. Although Fagan, who denies any new marketing strategy was adopted at that meeting, has repeatedly affirmed his intention not to reveal any confidential information of Donnelley, Donnelley argues that it will be virtually impossible for him not to draw upon his knowledge, consciously or unconsciously, of Donnelley's new pricing policies and other strategic information in the performance of his duties at Bowne. Donnelley also argues that it must obtain injunctive, as opposed to monetary, relief on the grounds that the damage it will suffer from Fagan's employment with Bowne or from disclosure of Donnelley's confidential information cannot be quantified.

The evidence offered by Donnelley, however, is not sufficient for a finding that the information at issue to which Fagan had access is confidential information entitled to protection under Illinois law. In con-

trast to sales, marketing and pricing practices, many of the cases cited by plaintiff involved actual "trade secrets" not divulged to customers, such as chemical formulas, manufacturing processes, *et al.* *E.g., Lawter, supra* (chemical formulas and chemist's laboratory notebook); *Donald McElroy, Inc. v. Delaney*, 72 Ill.App.3d 285, 27 Ill.Dec. 892, 389 N.E.2d 1300 (Ill. App.Ct. 1st Dist.1979) (equipment, processes and capability in photographic silver recovery); *Revcor, Inc. v. Fame, Inc.*, 85 Ill.App.2d 350, 228 N.E.2d 742 (Ill.App.Ct. 2d Dist.1967) (prints and drawings of blower wheel). *See also ILG Industries, Inc. v. Scott*, 49 Ill.2d 88, 92, 273 N.E.2d 393, 396 (Ill.1971) (factors to be considered in determining what information constitutes a "trade secret"); *Reinhardt Printing Co. v. Feld*, 142 Ill.App.3d 9, 96 Ill.Dec. 97, 490 N.E.2d 1302 (Ill.App.Ct. 1st Dist.1986) (sales techniques, pricing information and printing production methods held not trade secrets); *G & W Electric Co. v. Joslyn Manufacturing and Supply Co.*, 127 Ill. App.3d 44, 47–48, 82 Ill.Dec. 187, 190, 468 N.E.2d 449, 452 (Ill.App.Ct. 1st Dist.1984) (original proprietary information including design, development, manufacture and sale of electrical equipment may be protectable).

The Appellate Court of Illinois, Second District, recently described a trade secret as "a plan or process, tool, mechanism, compound or informational data utilized by a person in his business operations and known only to him and such other limited persons to whom it may be necessary to confide it." *The Label Printers v. Pflug*, 206 Ill.App.3d 483, 151 Ill.Dec. 720, 564 N.E.2d 1382 (Ill.App.Ct. 2d Dist.1991) (reversing circuit court's grant of preliminary injunction).[5] In that case, the court held that the information at issue did not constitute a trade secret and that the plaintiff

had not proven either that the information was confidential or that the ex-employee possessed information "which was not already known to plaintiff's competitors or which could not be easily ascertained by them." *Id.* *See ILG Industries, supra.*

Because Thursby gave inconsistent and vague testimony as to what constituted the confidential information which would entitle Donnelley to enforce the non-compete agreement under Illinois case law, the Court is unable to make a finding that the nature of Donnelley's marketing, sales and pricing strategy justifies such protection. At deposition and during cross-examination, Thursby testified that he considered confidential all information related to Donnelley's policies in the financial and legal printing business. Tr. 114–15. On redirect, Thursby testified that he did not consider as confidential any information which was generally available in the industry but did consider as confidential Donnelley's methods of pricing and "market exploitation," particularly the ideas that were discussed at the Hartford meeting. Tr. 127.[6]

In his testimony, Thursby described the information discussed at the Hartford meeting only in general terms, such as "policies" and "strategies" for the future. While this lack of specificity may have been due to an unwillingness to disclose more to Bowne's attorneys, Donnelley's counsel made no request of the Court to submit additional information *in camera* or under a confidentiality order. Thursby also testified that Donnelley's strategic plan is a "living document" which undergoes "constant evolution", due to the rapidly changing competitive environment of the printing industry. Tr. 36–37.

Fagan described the Hartford meeting differently, as a brainstorming session between Richard Thursby and some of Don-

---

**5.** Factors in determining whether information constitutes a trade secret include: "the extent to which the information is known outside the business; the extent of measures taken to guard the secrecy of the information; the value of it to the employer and to his competitors; the amount of effort and/or money expended in developing the information; and the ease or

difficulty with which it could be acquired or duplicated by others." *Id.* (citations omitted).

**6.** Fagan's uncontradicted testimony was that customers frequently tell printing firms the price that another printer has bid on a given job and that if a salesman wants to know what the competition is offering, he can simply ask a client. Tr. 257.

nelley's sales managers, including himself, with the purpose of deciding on a "wish list" of proposals for Thursby to present to Donnelley's senior management as a whole. Tr. 221–22. This testimony is uncontradicted. No testimony or evidence was presented by Donnelley that any of those proposals have ever been pursued or adopted by Donnelley, or even that they were ever presented to senior management, and Fagan testified that he knew of no such action having occurred by December, 1990, when he left Donnelley. Tr. 223–24.

■ Moreover, even if the discussions at the Hartford meeting centered around re-determining Donnelley's goals and new strategies to accomplish those goals, as Thursby testified, Tr. 36, an employer's ultimate goals or purposes are not considered trade secrets under Illinois law. *Vendo Company v. Stoner, supra,* 245 N.E.2d at 272. The technical "know-how" to achieve a particular goal may constitute a trade secret, *id.,* but not untried strategies or tactics at the discussion stage.

Although it may be that an actual pricing policy was agreed upon at the Hartford meeting with regard to different types of jobs and clients in different cities, Tr. 33, it was uncontested that competition in the financial and legal printing industry today is so keen that pricing is largely a matter of how great a discount a printer is willing to give to regular customers and whether or not it will offer a "cap" (or price ceiling), so that the customer will have price protection on a job, no matter what costs the printer actually incurs. Tr. 45–46. In light of the vague testimony about the nature of the pricing options and marketing strategies adopted, if any were adopted, and Thursby's admission that marketing strategies underwent "constant evolution," Tr. 36–37, the Court is unable to find that Fagan possessed confidential information protectable by injunctive relief.

### B. *Customer Lists*

■ Although a customer list may, under certain circumstances, qualify as confidential information, *Armour & Co. v. United American Food Processors,* 37 Ill. App.3d 132, 135–36, 345 N.E.2d 795, 798 (Ill.App.Ct. 1st Dist.1976), such is not the case with Donnelley's financial and legal customers. The names of potential customers or contacts for the sale of financial and legal printing services are readily available through any directory of financial or law firms, the largest of which are limited in number and well-known in this field of the printing industry. As a result, there is no ground for claiming that Donnelley's customer lists are confidential information. *American Claims Services, Ltd. v. Boris,* 137 Ill.App.3d 948, 951–52, 92 Ill.Dec. 723, 725, 485 N.E.2d 534, 536 (Ill.App.Ct. 1st Dist.1985). Under such circumstances, Illinois law does not afford injunctive relief. *See* 92 Ill.Dec. at 724, *id.* 485 N.E.2d at 535.

### C. *Near–Permanent Customer Relationships*

■ Even in the absence of confidential information or trade secrets, a former employer may have a protectable interest in its customer relationships which justifies enforcing a non-compete agreement, which is to be determined from the facts and circumstances of the case. *Cf. PCx Corp. v. Ross,* 168 Ill.App.3d 1047, 119 Ill.Dec. 474, 522 N.E.2d 1333 (Ill.App.Ct. 1st Dist. 1988) (computer hardware company was entitled to preliminary injunction, pending determination on merits, where evidence raised fair question of protectable interest; manifest weight of evidence showed near-permanent customer relationships and that former employee had disclosed and used confidential and proprietary information and had contacted protected customers). To obtain injunctive relief on this ground, the employer must show that it enjoys "near-permanent" customer relationships and that "but for his prior employment, the defendant would not have had contact with the clients in question." *American Claims, supra,* 92 Ill.Dec. at 724, 485 N.E.2d at 535.

■ Under Illinois law, several factors determine whether an employer enjoys "near-permanent" relationships with its customers such that the employer has a

"legitimate business interest" in protecting them which warrants the court's imposing a restraint on trade. *Corroon & Black, Inc. v. Magner,* 145 Ill.App.3d 151, 161–64, 98 Ill.Dec. 663, 670, 494 N.E.2d 785, 792 (Ill.App.Ct. 1st Dist.1986). *See Reinhardt Printing Co. v. Feld, supra.* Those factors include "the time, cost and difficulty involved in developing and maintaining the clientele, the parties' intention to remain affiliated for an indefinite period, and the continuity as well as the duration of the relationship." *Reinhardt, supra,* 96 Ill. Dec. at 102, 490 N.E.2d at 1307. *See also, Corroon, supra,* 98 Ill.Dec. at 670, 494 N.E.2d at 792. A court will also consider whether the employee would have had contact with the customers in question, but for his or her position with the employer. *The Label Printers v. Pflug, supra.*

■ The evidence does not support Donnelley's claims of "near-permanent customer relationships" with the clients listed in Exhibit 19.[7] While the testimony showed that Donnelley had done work for those clients and that, as a result, Fagan had some contact with some of those clients or supervised sales representatives who dealt with those clients, Tr. 207, or, in the case of Skadden Arps Slate Meagher & Flom, that Fagan had been instrumental in setting up a Donnelley service center at that law firm at some point, Tr. 86–87, there was no evidence that Donnelley's financial and legal printing group served the entire company, investment bank or law firm, as to each client listed, or, if not, which divisions, departments or practice groups of the firms listed were longstanding clients of Donnelley or which partners and "decision-makers" had longstanding relationships with Donnelley. Much of Thursby's testimony as to Fagan's contact with clients was not based on personal knowledge or did not specify what time period was involved. There was no testimony that any of the clients listed, or divisions or practice groups thereof, used only

or primarily Donnelley and not other legal and financial printers. Tr. 70–92. In fact, Thursby testified that Bowne serves different units, or departments, of at least some of the same customers for which Donnelley chose to seek protection under the employment agreement. Tr. 91.

There was no testimony as to any customers' intentions to establish or maintain an indefinite or continuous affiliation with Donnelley. On the contrary, both witnesses testified that in recent years, the major ground on which clients choose a printer for any given job is price. Tr. 31, 45–6, 124–25, 167. The testimony also revealed that customer contact was primarily the responsibility of sales representatives and that Fagan's direct contact with customers had been limited in recent years. Tr. 207–8.

There was testimony that the financial and legal printing business has experienced great turmoil since the stock market crashed in 1987, due to fewer financial deals taking place and the subsequent reduction in demand for such printing services, and that as a result the industry has changed dramatically. Tr. 29–30, 42, 166–68. Many printing firms have closed their doors and only a few remain. Tr. 29–30, 168. As a result, the three or four large financial and legal printing firms who remain are scrambling to pick up customers and orders which might have been served previously by defunct firms and the remaining firms are eager to gain any competitive edge. The fact that the market is in such flux contradicts Donnelley's claims of near-permanent customer relationships with the customers listed in Exhibit 19.

Donnelley has failed to prove the existence of a protectable, legitimate business interest justifying the broad restraint on Fagan's employment and on trade and competition which Donnelley seeks. The Non–Compete Agreement is unenforceable regardless of any provision compensating Fagan for observing its restrictions.

---

**7.** The exhibit was admitted into evidence only for the purpose of showing what clients had accounts with sales representatives who reported to Fagan in the last two years of his employment with Donnelley. Fagan testified that seven of the accounts listed were not under his

supervision. Tr. 206. By the terms of the Non–Compete Agreement, any customer contacts by Fagan, direct or indirect, before that time are immaterial to the enforcement of the Non–Compete Agreement.

## II. Injunctive Relief under the Confidentiality Agreement

A confidentiality agreement is also a restriction on trade, competition and the free flow of information, in the same manner as a non-compete agreement. *Disher v. Fulgoni*, 124 Ill.App.3d 257, 261–63, 79 Ill.Dec. 735, 739, 464 N.E.2d 639, 643 (Ill.App.Ct. 1st Dist.1984) (employee's confidentiality agreement will be invalidated if overbroad in scope and duration and trial court abused discretion in denying preliminary injunction sought by former employee to nullify restrictive covenant).[8] Before enforcing such an agreement, a court must determine that the restriction "will not be greater than is necessary to protect the proprietary interests of the employer." *Id.* As discussed above, Donnelley's evidence as to what it considered confidential information, the extent to which Fagan possessed such information, and the nature of Donnelley's proprietary interest in that information was vague, contradictory and conclusory. There was no evidence that Fagan has used or disclosed any Donnelley information for his benefit or that of Bowne. Accordingly, the evidence is insufficient for the Court to find that Donnelley is entitled to injunctive relief enforcing the terms of the Confidentiality Agreement.

Donnelley has failed to carry its burden of proving that it is entitled to the injunctive relief requested under the Non–Compete Agreement and the Confidentiality Agreement. Accordingly, the motion for an injunction is denied in its entirety.

## III. Defendants' Motion for Directed Verdict

Donnelley presented no evidence that Fagan has breached any enforceable provision of his agreements with Donnelley or that Donnelley has suffered any actual harm related to its other claims against Fagan and Bowne. Defendants' motion for a directed verdict on all claims is therefore granted. *See Lawter International, supra*, 72 Ill.Dec. at 26–27, 451 N.E.2d at 1349–51.

## CONCLUSION

For the reasons stated above, both a preliminary and permanent injunction are denied. Defendants' motion for a directed verdict on all claims against them is granted and the case is closed.

IT IS SO ORDERED.

8. In subsequent proceedings in the *Disher* matter, the appellate court upheld the trial court's determination that the confidentiality agreement was overbroad and invalid. *Disher v. Fulgoni*, 161 Ill.App.3d 1, 112 Ill.Dec. 949, 959, 514 N.E.2d 767, 777 (Ill.App.Ct. 1st Dist.1987), *app. den.*, 119 Ill.2d 555, 119 Ill.Dec. 384, 522 N.E.2d 1243 (Ill.1988). Among the reasons for the court's holding was the open-ended nature of the confidentiality obligation, as to both time and subject matter. 112 Ill.Dec. at 961, 514 N.E.2d at 779. The Confidentiality Agreement at issue here is similarly open-ended.